UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
AMERISOURCE CORPORATION,  :
  :
               Plaintiff,  :  **MEMORANDUM AND ORDER**
  :
               -against-  :  02 CV 2514 (DLI) (CLP)
  :
RX USA INTERNATIONAL, INC.,  :
PARSONS MEDICAL CENTER  :
PHARMACY, INC. (II), AND  :
PARSONS MEDICAL CENTER  :
PHARMACY, INC.,  :
  :
             Defendants.  :
-------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge**:

      Plaintiff Amerisource Corporation ("Plaintiff" or "Amerisource"), a wholesaler of pharmaceutical products, brought this action to collect on a debt allegedly owed them by defendants Rx USA, International, Inc., Parsons Medical Center Pharmacy, Inc. (II), and Parsons Medical Center Pharmacy, Inc. (collectively, "Defendants" or "RXUSA"). Defendants, in turn, brought certain counterclaims, including, *inter alia*, an antitrust claim pursuant to the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (2007) (the "Sherman Act"), and breach of contract and tortious interference claims. In the instant motion, Plaintiff moves this court for summary judgment on Defendants' antitrust, breach of contract, and tortious interference counterclaims.

      For the reasons stated more fully below, Amerisource's motion for summary judgment is granted in part and denied in part. Amerisource's motion is granted with respect to the Sherman Act claim because RXUSA has failed to provide any evidence of actual adverse effect on competition in the relevant market. RXUSA has, however, raised an issue of fact concerning the breach of contract claims and the tortious interference claim, which, accordingly, withstand summary

judgment.

**I.      Background**

Plaintiff, a Delaware corporation, is a wholesale distributor of pharmaceutical products. (Carter Dep. 25:25-26:2.) Defendants are New York corporations in the business of purchasing pharmaceutical products in order to resell them to other wholesalers, retailers, and individual customers. (Scovotti[1] Dep. 25:8-27:23.)

From 1999 to 2000, RXUSA purchased over $3 million worth of products from Amerisource. (Drucker Aff. ¶ 3.) RXUSA claims that Amerisource agreed to provide certain discounts on the products RXUSA purchased from it, but never provided the promised discounts. (Defs.' Br. 4-5.) Amerisource denies the existence of any agreements to provide discounts beyond the prices it actually charged for the products, as reflected in the invoices. (*See* Pl.'s 56.1 ¶ 6.)

Under RXUSA's version of the facts, in 1999, Wilfredo LaFontaine, Amerisource's marketing manager and/or salesperson at the time, visited RXUSA's business premises in order to solicit its business. (Drucker Aff. ¶ 7.) In speaking with Robert Drucker, the president of the defendant companies, LaFontaine discussed certain available discounts on Amerisource's products in order to gain RXUSA's business. (Drucker Aff. ¶ 7.) After several meetings, in the spring of 1999, LaFontaine allegedly offered RXUSA the following markdowns: (1) a 15% discount off the wholesale acquisition cost ("WAC") (or the price offered to pharmaceutical group purchasing

---

[1]RXUSA has not provided any information concerning who Mark Scovotti is. For some inexplicable reason, RXUSA has omitted the initial pages of Scovotti's deposition testimony that would enlighten the court in this regard, and RXUSA apparently did not see any need to provide this information within the pages of its brief. However, based on the portion of his deposition testimony included in the record, Scovotti appears to be an RXUSA employee, a fact with which Amerisource does not seem to disagree. (*See* Pl.'s Mem. 20.) Accordingly, for the purposes of this motion, the court will assume that Scovotti is an RXUSA employee.

2

organizations ("GPOs")[2], if applicable) for insulin products, as well as certain other pharmaceutical products (the "WAC-15% Discount"); (2) an additional 1% discount from the WAC price (or the GPO price, if applicable) for the top forty items RXUSA purchased from Amerisource (the "Top 40 Discount"); and (3) an additional 1.5% discount from the WAC price (or the GPO price, if applicable) for all products purchased in any month in which RXUSA's purchases exceeded $200,000 and RXUSA paid in a timely manner [(the "Volume Discount")]. (Drucker Aff. ¶¶ 8-9.)

LaFontaine asserts that he had the authority to grant some or all of the aforementioned discounts on behalf of Amerisource, but he states that he also sought and obtained approval from a supervisor, Anthony Capone, for each of the discounted terms. (*See* LaFontaine Dep. 265-274; 304.) Under the alleged offer, the discounts would not be applied as markdowns of the purchase price, which price would be reflected on the invoices; instead, they would appear as credits on future purchases, or be issued as rebate checks. (Drucker Dep. 120:9-121:17.) RXUSA claims it accepted Amerisource's offer and, in reliance on the promised discounts, began purchasing products from Amerisource. (Drucker Aff. ¶ 10.)

Amerisource never applied any credits to RXUSA's purchases, nor issued any rebates. (Defs.' Br. 6.) Nevertheless, RXUSA did not terminate its accounts with Amerisource right away because Drucker said he "was hearing the right things from [LaFontaine's] mouth, and if [LaFontaine] had problems getting [the credits] started and getting all of his paperwork in order I didn't want to kill what was turning out to be a highly successful, at least on the appearance, if they would have paid the money, relationship." (Drucker Dep. 231:3-11.) When, many months later, the

---

[2] GPOs usually consist of entities that belong to a certain trade class–hospitals, for example–that band together to negotiate directly with drug manufacturers for discounted pricing levels on certain products or classes of products. (*See* Batezel Dep. 171:21-177.)

3

discounts still were not applied despite Drucker's complaints, Drucker met with Capone, LaFontaine, and Joe Falletta, LaFontaine's direct supervisor, on January 19, 2000, to discuss Drucker's complaints and other issues. (*See* Drucker Dep. 231:12-232:9; LaFontaine Dep. 296:19-297:9.) The dispute was not resolved at the meeting. (*See* LaFontaine Dep. 297-299.)

On or about April 26, 2000, Amerisource fired LaFontaine. (Capone Dep. 206:5-14.) According to LaFontaine, he was fired, in part, because he insisted that Amerisource honor its commitments to RXUSA. (LaFontaine Dep. 300:15-301:11.) Amerisource's explanation for LaFontaine's firing was that he "mishandl[ed]. . . the January 19th meeting with Drucker and other matters." (Pl.'s Mem. 9.)

Prior to the January 19 meeting, in September and October 1999, RXUSA began to seek out alternate sources for the products it was purchasing from Amerisource. (Drucker Dep. 232:14-23.) RXUSA approached other large wholesale businesses, including McKesson, Cardinal, Bellco, BergenBrunswick, and others, to request that they open credit accounts for RXUSA. (Drucker Dep. 232:24-233:3.) In each case, RXUSA states that the wholesaler refused to open the requested account. (Defs.' Br. 11-12.) Each wholesaler allegedly informed RXUSA that Amerisource had told the wholesaler that RXUSA was a bad credit risk and that the wholesaler could not deal with RXUSA without Amerisource's prior approval. (*See* Scovotti Dep. 106:14-18; 113:14-19; 95:10-21; 122:10-14.)

RXUSA alleges that the wholesalers refused to deal with it because they had conspired to divide up their customers, including RXUSA, and group boycott each others' customers. (Defs.' Br. 22.) Moreover, RXUSA contends that they were unwilling to deal with RXUSA in particular because Amerisource informed the other wholesalers at a monthly group credit meeting involving

4

all of the major wholesalers that they should not deal with RXUSA because it was a bad credit risk. (Defs.' Br. 13-14.) In addition, RXUSA claims that Amerisource discussed at one of the meetings "a contemplated future litigation" involving RXUSA, stating that RXUSA owed it $250,000. (Defs.' Br. 14; *see* Defs.' Ex. M[3].) At the time of Amerisource's alleged comments, RXUSA's accounts with Amerisource were in good standing. (*See* Wertz Dep. 58:8-15.)

RXUSA states that it was consequently unable to purchase virtually any insulin the following year. (Drucker Dep. 261:24-262:11.) In addition, although RXUSA was able to purchase non-insulin products from various wholesalers, including McKesson, Cardinal, Bellco, JJ Ballan, and Kinray, the wholesalers allegedly would only agree to unfavorable pricing terms and would not permit RXUSA to purchase on credit, but only through cash on delivery ("COD"). (Drucker Dep. 259:19-260:2; 255:15; 342:10-10-11; 446:9-447:7; 475:23-476-3.)

Following the January 19 meeting, RXUSA ceased paying its accounts with Amerisource, and the instant action ensued.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the

---

[3]Both parties have failed to submit affidavits by individuals who, based on personal knowledge, can verify the authenticity of the documents submitted as exhibits to the respective briefs. Neither party, however, has objected to the submissions of the other, except in one instance discussed *infra*, and the court will, therefore, assume, for the purposes of this summary judgment motion, that the exhibits are verified.

nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. - - -, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 1776.

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir. 1994) (citation omitted).

### B. Sherman Act Claim

The Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To establish a claim under section one of the Sherman Act, a plaintiff must prove "(1) a combination of some form of concerted action between at least two legally distinct economic entities; and (2) [that] such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998). Furthermore, in order to succeed in an action brought under the Sherman Act, the

plaintiff must prove antitrust injury. *George Haug Co. v. Rolls Royce Motor Cars*, 148 F.3d 136, 139 (2d Cir. 1998). "The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Id.* (internal quotation marks and citation omitted) (emphasis in original).

However, certain group boycotts designed to cut competitors out of the market altogether constitute *per se* violations of the Sherman Act, obviating the need to demonstrate actual adverse effect. *See Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042-43 (2d Cir. 1976). In general, "[c]ases to which [the Supreme Court] has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage *competitors* by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the *competitive* struggle." *Bennett v. Cardinal Health Marmac Distribs., Inc.*, 02 CV 3095(JG), 2003 WL 21738604, at *4 (E.D.N.Y. July 14, 2003) (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)) (emphasis in *Bennett*). *Per se* treatment is not appropriate in circumstances where anticompetitive effects on the market are not readily obvious or clearly apparent. *See Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999)).

The instant case is not a situation requiring application of the *per se* rule, despite RXUSA's arguments in favor of its application. Assuming, *arguendo*, that the major wholesalers, including Amerisource, engaged in a forbidden "concerted action," there are no clearly apparent anticompetitive effects arising from any of their actions. RXUSA has not alleged that a competitor was behind the claimed group boycott. Nor has RXUSA asserted that the alleged boycott was aimed at a *competitor* of the purported conspirators, but rather at one of their prospective *customers*. In the

7

absence of any obvious anticompetitive effects on the market, the *per se* rule simply has no place here. *See Bennett*, 2003 WL 21738604, at *4 (denying application of the *per se* rule, reasoning that, "[w]here no competitor of either the defendants or the plaintiffs is in some way related to the concerted refusal to deal, it is difficult to conceive of the anticompetitive effects of the challenged conduct.")

Having determined that the *per se* rule is inapplicable, the court now turns to the issue of whether there were actual adverse effects on competition, as otherwise required for a Sherman Act claim. *See George Haug Co.*, 148 F.3d at 139. "Actual adverse effects include reduced output, decreased quality, increased prices or the imposition of barriers to entry" within the relevant market. *Bennett*, 2003 WL 21738604, at *3 (citing *Top Mkts., Inc.*, 142 F.3d at 96). RXUSA has not provided evidence to demonstrate any of these. Instead, RXUSA argues that it can "demonstrate 'adverse effect' indirectly by establishing that the violators have sufficient market power to cause an adverse effect on competition" quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 128-29 (2d Cir. 1995). RXUSA continues:

> there is no question that the Plaintiff and its co-conspirators control a very large majority of the New York market and more than 95% of the national wholesale pharmaceutical distribution in the United States. Indeed, McKesson, Cardinal and Amerisource (all members of the 'credit group' here), are the three largest pharmaceutical wholesalers in the world. There is absolutely no question that the members of the credit group here have such enormous market power in the wholesale pharmaceutical [*sic*] that they can collectively absolutely control the market.

(Defs.' Br. 31-32.) This quoted language is the entire sum and substance of RXUSA's purported "evidence" of the alleged conspirators' market power, and it amounts to no more than unsubstantiated allegations. Nevertheless, even if RXUSA had raised an issue of fact concerning the alleged conspirators' market power, a demonstration of market power alone still is not enough

to show adverse effect. *See K.M.B. Warehouse Distribs., Inc.*, 61 F.3d at 129 (stating that "a showing of market power, while necessary to show adverse effect indirectly, is not sufficient" and that "[t]here must be other grounds to believe that the defendant's behavior will harm competition market-wide, such as the inherent anticompetitive nature of defendant's behavior or the structure of the [relevant] market"). As RXUSA has not provided any "other" evidence to demonstrate an indirect adverse effect on the relevant market, it has failed to raise an issue of fact with respect to the adverse effect requirement. Thus RXUSA's Sherman Act claim cannot survive Amerisource's motion for summary judgment.

### C. Tortious Interference

To state a claim for tortious interference with prospective economic advantage, a plaintiff must demonstrate "(1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994). In addition, there must be a causal nexus between the injury and the alleged interference. *See Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 254 (S.D.N.Y. 2001). The first element is easily satisfied, as it is undisputed that RXUSA engaged in business discussions with numerous third-party wholesalers with the very real prospect of entering into contracts with them to purchase pharmaceutical products.

With respect to the second and third elements, RXUSA alleges that Amerisource informed third-party wholesalers that RXUSA was a bad credit risk in order to interfere with RXUSA's prospective business relations with the wholesalers. In support of its allegation, RXUSA offers Drucker's and Scovotti's testimony that credit managers from various third-party wholesalers

informed them that Amerisource had given RXUSA a bad credit rating[4] despite the fact that, according to both parties, RXUSA was in good credit standing at the time. (*See* Defs.' Br. 11-12, 38; Wertz Dep. 58:8-15.) RXUSA also provides LaFontaine's testimony that Capone informed him that Capone was planning to instruct Amerisource's credit manager to "snow-ball" RXUSA, or, as LaFontaine explained, "bad-mouth" the company to the other wholesalers so that no other wholesaler would open an account with RXUSA. (*See* LaFontaine Dep. 252:8-253:2; 244:14-245:10.) As evidence that Amerisource did in fact "snow-ball" RXUSA at a credit meeting apparently held in or around September 1999, RXUSA presents a handwritten note allegedly written at "a credit meeting. . . by a participant therein," which reads, "Amerisource threatens suit for credit slander will not discuss 250K Litigat. RXUSA RXUSAII Parson Medical."[5] (*See* Defs.' Br. 14; Defs.' Ex. M; Pl.'s Mem. 8 (citing Defs.' Ex. F).) In addition, RXUSA presents what appears to be a Bellco invoice that states "Bad Credit Cust" beside the balance due amount as evidence that Amerisource informed other wholesalers that RXUSA was a bad credit risk. (*See* Defs.' Ex. N.) Together, this evidence raises issues of fact concerning whether Amerisource interfered with RXUSA's prospective business relations (second prong) and, if so, whether Amerisource's interference was dishonest, unfair, or improper (third prong).

---

[4]Amerisource challenges the admissibility of these statements on hearsay grounds under Federal Rule of Evidence 802. While a hearsay statement by itself would be insufficient to raise an issue of fact for the purposes of summary judgment, *Patterson v. City of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004), Defendants here do not rely solely on Drucker's and Scovotti's statements, but also offer other evidence that, together, serve to raise an issue of fact with respect to the second and third tortious interference prongs. Accordingly, this court need not address Amerisource's hearsay argument at this time.

[5]As alluded to earlier, RXUSA has not provided any information to the court, in the form of an affidavit or otherwise, concerning the derivation and authenticity of this note, nor any information concerning the identity of its author or the company at which the author was employed, or the basis for RXUSA's claim that the note was written at a credit meeting. However, Amerisource does not challenge the note on any of the aforementioned grounds. Taking the evidence in the light most favorable to the nonmovant, the court thus accepts Defendants' inference that the note was written by an employee of a third-party wholesaler at a monthly credit group meeting in or around September 1999.

Regarding the fourth element, injury to the prospective business relationship, RXUSA alleges that, as a result of Amerisource's interference, it was virtually unable to purchase any insulin the following year. (Drucker Dep. 261:24-262:11.) In addition, although RXUSA was able to obtain some quantity of its other required products from various wholesalers, it was only able to purchase these products on unfavorable pricing terms and only on COD, rather than on credit. It is not clear to this court, based on the record, whether the contractual terms RXUSA received from third-party wholesalers were, in fact, worse than those it would have received had Amerisource not allegedly interfered. Nonetheless, this question raises an issue of fact with respect to the injury requirement. Moreover, RXUSA has also raised an issue of fact by offering Drucker's testimony that RXUSA was unable to purchase any insulin the year following the alleged interference.

Finally, if, in fact, Amerisource wrongfully interfered with RXUSA's prospective business relations, it is plausible, as RXUSA has set forth, that Amerisource's interference caused, in part or in full, RXUSA's alleged injuries. Accordingly, the question of causation is one for the jury, and not the court, to determine.

As RXUSA has successfully raised an issue of fact with respect to each of the disputed elements of its tortious interference claim, Amerisource's motion for summary judgment on this claim is denied.

    **D.**    **Contract Claims**

        **1.**    **Alleged Discounts**

            **a.**    **Statute of Frauds**

To prove a breach of contract claim under New York law, a claimant must show (1) the existence of a contract, (2) adequate performance by the claimant, (3) breach by the defendant, and

(4) damages caused by the breach. *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 492 F.3d 39, 41-42 (2d Cir. 2005). In addition, under the Statute of Frauds,

> a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

N.Y. U.C.C. § 2-201(1) (2007).

Amerisource argues that, because the alleged discounts are not evidenced by a writing, RXUSA's breach of contract claim based on Amerisource's alleged failure to honor the purported discounts must fail under the Statute of Frauds. RXUSA, on the other hand, contends that the writings evidencing its contractual relationship with Amerisource include invoices and various correspondence involving LaFontaine and other Amerisource employees, and such writings are adequate for Statute of Fraud purposes.

This court finds that sufficient writings exist to satisfy the Statute of Frauds. Each invoice accompanying the products Amerisource delivered to RXUSA on a particular date contains all of the essential terms of that transaction (except for price, which is discussed *infra*) and, accordingly, constitutes an enforceable contract as to that particular transaction. *See Reforestacion Cafetalera Agro-Industrial S.A. v. Campesino Food Corp.*, 97 Civ. 5553(RCC), 1999 WL 4964, at *2 (S.D.N.Y. 1999) (finding that purchase orders and invoices were sufficient to satisfy the Statute of Frauds). Accordingly, the requirement for a writing under the Statute of Frauds is fulfilled.

### b.     Admissibility of Extrinsic Evidence

The invoices accompanying the products delivered to RXUSA contain the following merger clause:

> This contract constitutes the entire agreement between Buyer and Seller relating to the goods or services covered hereunder. No modification shall be binding upon the Seller unless in a writing signed by Seller's duly authorized representative.

(*See* Defs.' Ex. H ¶ 17.) However, the invoices also state that "[t]he price identified for the goods invoiced on the reverse may not reflect all allowances and discounts given on those goods." (*See* Defs.' Ex. H ¶ 16.) Therefore, despite the merger clause, the invoices are not a complete representation of all of the agreed-upon terms. Instead, the invoices expressly permit the consideration of extrinsic evidence in ascertaining the allowances and discounts agreed to by the parties, if any.[6]

RXUSA provides sworn testimony by Drucker, LaFontaine, and Mark Scovotti attesting that Amerisource agreed to the WAC-15% Discount, the Top 40 Discount, and the Volume Discount. (*See* Drucker Aff. ¶ 8; LaFontaine Dep. 274:20-275:14, 264:25-265:6, 303:22-304:16; Scovotti Dep. 88:11-89:15.) RXUSA further provides a letter dated May 31, 2000 written by LaFontaine to Richard Carter that mentions a discount of "10% below WAC on 3 to 4 insulin items" and a rebate of "cost reduced by -1.5%WAC."[7] (*See* Defs.' Ex. I.) RXUSA also presents an unverified electronic mail ("e-mail") dated September 23, 1999 purporting to be written by LaFontaine to Drucker

---

[6]Amerisource argues that this court should follow the holding in *Reforestacion Cafetalera Agro-Industrial S.A.*, 1999 WL 4964, in which the court rejected a claim for an alleged "oral" discount off prices listed on invoices. *See id.* at \*2. However, *Reforestacion* is distinguishable because the claimed discount there was a modification of the parties' original contract, requiring a writing under N.Y. U.C.C. § 2-209(3). Here, the alleged discounts relate to the price originally agreed upon by the parties, and do not purport to be a modification of the invoice-contracts. Furthermore, there is no indication in *Reforestacion*, that there was a clause contained in the invoices there expressly permitting extrinsic evidence with respect to the price term, as is the case here.

[7]In his affidavit, LaFontaine alleges that the "10%" figure was a typographical error and should have read "17%." (LaFontaine Dep. 327:4-16.)

13

discussing a discount of "17% off wac."[8] (*See* Defs.' Ex. F.)  In addition, RXUSA highlights a letter written by Capone to LaFontaine conceding the existence of "commitments" made by LaFontaine to the RXUSA account.  (*See* Defs.' Ex. G.)  This evidence is sufficient to raise an issue of fact concerning whether Amerisource agreed to any discounts beyond the prices listed on the invoices and, if so, the terms of the agreed-upon discount(s).  The issue of LaFontaine's credibility as a former Amerisource employee who was fired from his position is an issue for the jury and not the court. Therefore, summary judgment is denied with respect to the breach of contract claim relating to the alleged discounts.

### 2. Failure to Use True WAC Prices

Amerisource also seeks dismissal of RXUSA's breach of contract claim relating to whether Amerisource used true WAC prices.  Amerisource contends that RXUSA has presented no evidence in support of its allegation.  To the contrary, RXUSA has presented invoices and a chart reflecting that Amerisource billed it different prices for the same items sold on the same day.  (*See* Defs.' Exs. L & M.)  While the evidence does not settle the issue of what the correct WAC price was for those items, it does tend to show that Amerisource failed to charge the correct WAC price for at least some of the items sold to RXUSA.  Accordingly, Amerisource's summary judgment motion regarding this breach of contract claim is also denied.

## III. Conclusion

For all of the foregoing reasons, Amerisource's motion for summary judgment is granted

---

[8]Amerisource points out that this e-mail is unverified, but nonetheless challenges the e-mail on its merits.  (*See* Pl.'s Mem. 9-10.)  Although the e-mail is not admissible as evidence without appropriate foundation and verification, neither party has been a model of proper lawyering with respect to its submissions, as none of the exhibits is accompanied by verifying affidavits.  *See, supra*, n.3.  Accordingly, as to the September 23, 1999 e-mail, the court has considered it for the purposes of this summary judgment motion, though the court's decision does not rely solely on this e-mail.

with respect to RXUSA's Sherman Act claim. However, Amerisource's motion is denied with respect to the breach of contract and tortious interference claims, which survive summary judgment.

SO ORDERED

DATED:    Brooklyn, New York
          September 26, 2007

                                            _____/s/_____
                                                  DORA L. IRIZARRY
                                               United States District Judge