UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
AMERISOURCE CORPORATION,

        Plaintiff,

     -against-

RX USA INTERNATIONAL INC., PARSONS
MEDICAL CENTER PHARMACY INC., and PARSONS
MEDICAL CENTER PHARMACY INC. (II)

        Defendants.
------------------------------------------------------------------------X

**MEMORANDUM OF
DECISION**

02-CV-2514 (JMA)

A P P E A R A N C E S:

Craig D. Mills
Buchanan Ingersoll, & Rooney PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103

Paul G. Nofer
Klehr, Harrison, Harvey, Branzburg, & Ellers
260 South Broad Street
Philadelphia, PA 19102
     *Attorneys for Plaintiff*

Michael L. Levine
The Law Firm of Michael Levine
15 Barclay Road
Scarsdale, NY 10583
     *Attorney for Defendants*

**AZRACK, J., United States Magistrate Judge:**

     In this action for breach of contract, plaintiff Amerisource Corporation ("plaintiff" or

"Amerisource") alleges that defendants Rx USA International Inc., Parsons Medical Center

Pharmacy Inc., and Parsons Medical Center Pharmacy Inc. (II) (collectively "defendants" or

"RxUSA") failed to pay Amerisource for goods delivered to and accepted by RxUSA pursuant to

the parties' 1999 agreement for the sale and purchase of pharmaceutical products. RxUSA

counterclaimed for breach of contract alleging that Amerisource overcharged RxUSA and failed to honor various price discounts that an Amerisource sales representative verbally promised to RxUSA.[1] On March 25, 2008, the parties consented to my jurisdiction over all matters. The Court held a bench trial with an advisory jury between January 26 and February 4, 2009. After approximately ninety minutes of deliberation, the jury rendered an advisory verdict in favor of Amerisource in the amount of $275,427.27. Amerisource then moved for contractual interest and attorneys' fees.

Having considered the relevant evidence and testimony, the Court adopts the jury's advisory verdict and orders judgment in favor of Amerisource on the reciprocal contract claims. In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court issues the following findings of fact and conclusions of law.[2]

## I. FINDINGS OF FACT

The material facts are largely undisputed. Plaintiff Amerisource is a Fortune 500 pharmaceutical distributor that sells prescription and over-the-counter drugs to wholesale and retail pharmacies. Amerisource buys product from manufacturers at the wholesale acquisition cost ("WAC") and generally sells the product at some percentage above or below WAC. The sale price varies from buyer to buyer and depends on a variety of factors including volume, payment terms, credit assessments, and the nature of the buyer's pharmacy business. Amerisource also offers some buyers a "Hot List" discount for products purchased from a predetermined list of eligible products. Price is further affected by manufacturer discount and

---

[1] RxUSA also counterclaimed for defamation, violations of state and federal antitrust laws, and tortious interference with business relations. It voluntarily withdrew the defamation claims and the Hon. Dora L. Irizarry, U.S. District Judge, dismissed the antitrust claims on summary judgment. The parties tried the tortious interference claim to a jury, which returned a verdict of no liability in favor of Amerisource.

[2] To the extent that any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law, and vice versa. See Miller v. Fenton, 474 U.S. 104, 113–14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

rebate programs that are implemented through Amerisource. The manufacturers establish the eligibility criteria and approve the discounts.

Defendants were licensed New York pharmacies owned and operated by Robert Drucker ("Drucker"), their sole executive and majority shareholder during the relevant period. Rx USA International, Inc. engaged in both wholesale and retail sales and included an online pharmacy. Parsons Medical Center Pharmacy Inc. and Parsons Medical Center Pharmacy Inc. (II) operated as a single retail pharmacy under the name Parsons Medical Center. Drucker operated the RxUSA pharmacies out of his dry cleaning business in Queens, New York with the assistance of a handful of employees.

In March 1999, Amerisource sales representative Wilfredo LaFontaine ("LaFontaine") made an unsolicited sales call to RxUSA's Queens headquarters. Thereafter, RxUSA agreed to purchase pharmaceuticals from Amerisource at WAC-0% under three separate accounts. RxUSA also signed up for manufacturer discounts that were to be applied at the time of invoicing if approved by the manufacturer. Amerisource later granted one of the RxUSA accounts a WAC-.5% Top 40 Hot List discount, which was to be applied to a predetermined list of forty eligible products. However, RxUSA failed to submit a valid Top 40 list to Amerisource and this discount was never triggered.

The negotiated price terms were memorialized on Amerisource "customer load sheets," which were used to open each of the three RxUSA accounts. Upon opening the accounts, Drucker also signed a "Terms of Sale" agreement, which includes provisions governing Amerisource's rights to prejudgment interest, attorneys' fees, and costs in the event that RxUSA's accounts became overdue.[3] No other price adjustments were negotiated at any point.[4]

---

[3] The Court's findings and conclusions regarding interest, attorneys' fees, and costs are discussed below.

RxUSA began purchasing pharmaceuticals from Amerisource immediately after opening its three accounts and ordered several hundred thousand dollars worth of product each month over the course of the next year. To facilitate ordering and shipping, Amerisource supplied RxUSA with a computer and ordering software that was programmed to reflect the prices specific to the terms negotiated for each of the three RxUSA accounts. At one point, Amerisource uploaded the wrong prices to the software. Drucker saw the incorrect, lower prices for a brief period before Amerisource discovered and rectified the error. RxUSA subsequently continued to order product from Amerisource and Amerisource regularly delivered and invoiced the orders at WAC-0%. Upon delivery of each shipment, an RxUSA employee signed an invoice reflecting WAC-0% prices and RxUSA paid the majority of the invoices accordingly each time it exceeded its credit limit.

RxUSA continued to order product from Amerisource until April 2000. Throughout this period, Drucker complained to Amerisource managers and executives about shipment shortages, billing errors, and Amerisource's failure to issue credits and rebates in accordance with RxUSA's manufacturer discount elections. He also complained vigorously to LaFontaine, with whom he maintained a close secret relationship, about Amerisource's failure to offer RxUSA the lower prices that he believed were available to other buyers. Drucker repeatedly pressed LaFontaine for help in getting lower prices. Though LaFontaine claimed to Drucker that he was trying, he mainly stalled. Aside from a single letter to his supervisor requesting a WAC-1% volume discount on future orders, there is no evidence that LaFontaine lobbied or received

---

[4] RxUSA's key evidence in support of additional discounts was Drucker's trial testimony and LaFontaine's deposition testimony. Neither witness was credible and their assertions regarding the discounts cannot be corroborated with any evidence that originates from someone other than themselves. Indeed, letters written prior to litigation by both Drucker and LaFontaine conflict with the alleged discounts that RxUSA now claims. For example, on several occasions Drucker made written demand for a Top 20 Hot List discount, whereas at trial he asserted a Top 40 Hot List discount. Trial Exs. 62, 67. In a May 2000 letter to Amerisource that LaFontaine and Drucker wrote together after LaFontaine had been fired, LaFontaine claimed that AmeriSouce had promised RxUSA a WAC-10% insulin discount while RxUSA now claims that it was entitled to a WAC-15% discount. Trial Ex. 85.

approval for the discounts off the existing RxUSA contract. However, after informing Amerisource executives that RxUSA had the potential to grow its business to millions in sales per month, Amerisource told LaFontaine to draft a formal sales agreement for future high-volume business with RxUSA. Though Amerisource instructed Lafontaine not to show any drafts to Drucker, Lafontaine sent the entire agreement to Drucker via email and modified it according to Drucker's instructions. Drucker and LaFontaine exchanged several drafts but never executed final agreement.

Meanwhile, beginning in January 2000, Drucker began asserting to Amerisource executives that RxUSA was entitled to unspecified insulin credits, a WAC-1.5% volume discount, and a WAC-1% Top 20 Hot List discount. Amerisource permitted RxUSA to return some products and issued some refunds based on Drucker's complaints, but disputed most of his claims. In several instances, Amerisource discovered that RxUSA was not eligible for the manufacturer discounts it claimed and billed RxUSA for the difference.

In April of 2000, RxUSA stopped paying Amerisource, but continued to order and accept products, which Amerisource invoiced in full compliance with the terms of the agreement. By May 2000, RxUSA owed Amerisource $275,427.27 for products from Amerisource. When Amerisource demanded payment, Drucker refused, claiming that Amerisource owed RxUSA over $400,000 in discounts, credits, and rebates that were verbally promised to him by LaFontaine, but not honored by Amerisource. He further asserted that Amerisource failed to invoice the products at the true WAC price.

## II. CONCLUSIONS OF LAW

To prevail on a breach of contract claim under New York law, which the parties agree govern this contract, a plaintiff must prove by a preponderance of evidence: (1) that a contract

existed between the parties; (2) that the plaintiff performed on the contract; (3) that the defendant breached the contract; and (4) that the plaintiff suffered damages as a result of the defendant's breach.  See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).

Based on the above facts proven at trial, and in accordance with the jury's advisory verdict, the Court concludes that a contract for the sale and purchase of pharmaceuticals at WAC-0% existed between the parties; that Amerisource adequately performed its material obligations under the contract by delivering goods to and billing RxUSA at the agreed price; that RxUSA breached the contract by failing to pay for accepted goods; and that Amerisource suffered a financial loss as a result of RxUSA's breach.  Conversely, the Court concludes that RxUSA failed to prove its breach of contract counterclaim because it established neither its own adequate performance nor breach by Amerisource.  Specifically, RxUSA failed to prove that the contract included the discounts it now claims or that Amerisource did not charge true WAC.

## III. REMEDIES

For RxUSA's breach, Amerisource seeks $275,427.27 in past due invoices, $748,635.05 in prejudgment interest, and $2,618,657.51 in contractual attorneys' fees, costs, and expert fees. RxUSA challenges the amount of prejudgment interest available under the contract, but does not object to Amerisource's methodology or calculations regarding interest.   RxUSA objects to the fees application on the ground that under the contract Amerisource is only entitled to fees incurred in connection with its contract claim and therefore should not be awarded fees expended on defense of the counterclaims.  However, RxUSA raised no objections to the Amerisource's hourly rates, number of hours expended, specific cost expenditures, or associated records.

## A. **Contract Price.**

Under New York law, a seller who prevails on a breach of contract claim may recover the contract price of accepted goods. N.Y. U.C.C. § 2-709(1)(b); see also Hyosung America, Inc. v. Sumagh Textile Co., Ltd., 137 F.3d 75, 80–81 (2d Cir. 1998). Here, unpaid invoices signed by RxUSA employees show that RxUSA accepted, but failed to pay for, goods totaling $275,274.27 across its three accounts. Accordingly, and consistent with the jury's advisory verdict, the Court directs entry of judgment against Rx USA International, Inc. in the principal sum of $175,718.26 and against Parsons Medical Center Pharmacy Inc., and Parsons Medical Center Pharmacy Inc. (II) in the principal sum of $99,709.01.

## B. **Prejudgment Interest.**

In a diversity action such as this, state law governs the availability of prejudgment interest. See Baker v. Dorfman, 239 F.3d 415, 425 (2d Cir. 2000). New York law entitles the prevailing party in a breach of contract claim to prejudgment interest as a matter of statutory right. Paddington Partners v. Bouchard, 34 F.3d 1132, 1139 (2d Cir. 1994) (citing N.Y. C.P.L.R. § 5001(c)). Interest accrues at the rate of 9% per annum unless otherwise provided in the contract and is computed from the date the principal became past due through the date of judgment. See id. at §5001(b)–(c); E*Trade Financial Corp. v. Deutsche Bank AG, No. 09-CV-3029, 2010 WL 1196814, at *3 (2d Cir. Mar 30, 2010) (citing NYCTL 1998-2 Trust v. Wagner, 61 A.D.3d 728, 729 (2d Dep't 2009)).

Here, it is undisputed that the prejudgment interest rate is governed by the Terms of Sale (the "Terms"), which Drucker signed on behalf of each of the defendants upon opening their respective Amerisource accounts. The Terms include two provisions relevant to prejudgment interest. The first states: "All past due balances are subject to a Service Charge of 1.50% per

month." After reciting a number of other provisions regarding access to credit history and other payment logistics, the Terms go on to state: "Should Amerisource find it necessary to obtain assistance in collecting any past due balances, I/We agree to pay interest at the rate of 1.50% (or such other rate allowable by State Law) . . . ." Amerisource asserts that the two provisions combined establish a single prejudgment interest rate of 1.5% per month. RxUSA asserts that the two provisions create two distinct obligations and that prejudgment interest is governed solely by the latter. Since that provision does not explicitly identify the frequency with which interest is to be assessed, RxUSA argues that it sets a one-time lump sum prejudgment interest charge equivalent to 1.5% of the unpaid balance, regardless of the delay in payment.

To determine RxUSA's contractual prejudgment interest obligations, the Court must read the Terms of Sale as a whole. See <u>Adams v. Suozzi</u>, 433 F.3d 220, 228 (2d Cir. 2005). Every part must be interpreted with reference to the whole and, if possible, must be interpreted so as to give effect to its general purpose. <u>Id.</u> "[T]he intent of the parties governs" and the "contract should be construed so as to give full meaning and effect to all of its provisions." <u>Am. Express Bank Ltd. v. Uniroyal, Inc.</u>, 164 A.D.2d 275 (1st Dep't 1990) (citations omitted). If the contract "is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument." <u>British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.</u>, 342 F.3d 78, 82 (2d Cir. 2003) (<u>quoting</u> <u>Rainbow v. Swisher</u>, 72 N.Y.2d 106, 109 (1988)). Additionally, words must be given the plain meanings ordinarily ascribed to them and absurd results should be avoided. <u>Mastrovincenzo v. City of N. Y.</u>, 435 F.3d 78, 104 (2d Cir. 2006).

In light of these principles, the only reasonable interpretation of the Terms is that they require prejudgment interest to be assessed at a rate of 1.5% <u>per month</u> rather than as a one-time flat fee. Consistent with the overall thrust of the Terms, the explicit 1.5% per month service

charge was clearly designed not only to encourage timely payment, but also to mitigate the past due balance's inevitable loss in value over time. Thus, the service charge serves the same purpose as prejudgment interest. See, e.g., Kassis v. Teachers' Ins. & Annuity Ass'n, 13 A.D.3d 165, 165 (1st Dep't 2004) ("The purpose of prejudgment interest is to compensate parties for the loss of the use of money they were entitled to receive, taking into account the 'time value' of money."). Courts routinely interpret such "service charge" language as establishing a contractual rate of prejudgment interest that supersedes the statutory rate. See, e.g., Warren Electrical Supply Inc. v. Davidson, 284 A.D.2d 869, 870–71 (3d Dep't 2001) (awarding prejudgment interest at the contract's service charge rate of 2% per month); see also Consolidated Container Co. LP v. Package Supply & Equip. Co., No. 09-CV-1478, 2009 WL 3365949 (N.D.G.A. Oct. 19, 2009) (awarding prejudgment interest based on the contract's 18% "monthly service charge rate" rather than the statutory rate); Power Tools & Supply, Inc. v. Cooper Power Tools, Inc., 543 F. Supp. 2d 749, 767 (E.D.M.I. 2008) (same); Vulcan Auto. Equip., Ltd. v. Global Marine Engine & Parts, Inc., 240 F. Supp. 2d 156, 160, 163 (D.R.I. 2003) (same); The Scotts Co. v. Central Garden & Pet Co., 256 F. Supp. 2d 734, 746 (S.D.O.H. 2003) (same); Hillside Enterprises v. Carlisle Corp., 69 F.3d 1410, 1416 (8th Cir. 1995) ("Although the contract uses the term 'service charge,' a sensible reading of the provision indicates it is an interest rate.").

The one-time assessment advocated by RxUSA is not only inconsistent with the ordinary and plain meaning of "interest," but would also require the Court to ignore all of the other provisions of the Terms, which are designed to encourage timely payment, mitigate the buyer's delinquency, and protect the contract's value to Amerisource in the event of breach. RxUSA's interpretation would render the parties' interest agreement essentially meaningless and would lead to an unreasonable result. At a single assessment of 1.5%, RxUSA would pay barely more

than $4,000 in interest for a $275,000 debt that is over nine years overdue. Given that this was an arm's length deal between sophisticated parties, the Court is unpersuaded that Amerisource intended such a substantial downward departure from its statutory rights or that RxUSA expected that it would be granted such a favorable rate without having to make a comparable concession of its own. Moreover, though the latter provision referring explicitly to interest does not specify a monthly rate, its reference to a "rate" of interest rather than a mere percentage reveals an intention to assess interest periodically rather than once.

The Court also rejects RxUSA's argument that Amerisource is not entitled to relief under the service charge provision because it did not state a claim for such relief in its complaint. First, the complaint does pray for 1.5% per month interest and quotes the service charge provision in support of this request. See Compl. ¶¶ 21, 25, 29, 36(B), 40. Second, in awarding damages, the Court is not limited to the relief requested in the complaint, but rather may award any relief that it deems just and proper. See N.Y. C.P.L.R. § 3017(a) ("Except as provided in section 3215 [concerning default judgments], the court may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just."); see also Fed. R. Civ. P. 54(c) (directing that aside from default judgments, "[e]very other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"). Finally, even if the service charge were an additional contract remedy independent of prejudgment interest, the judgment would be unaffected. Since both forms of relief compensate for the same loss, equitable rules against double recovery and unjust enrichment would prevent Amerisource from collecting damages under both provisions. See Phelan v. Local 305 of United Ass'n of Journeymen, 973 F.2d 1050, 1063 (2d Cir. 1992) (citing Ostano Commerzanstalt v. Telewide Systems, 880 F.2d 642, 649 (2d Cir. 1989)).

Accordingly, Amerisource is entitled to prejudgment interest at the contractual rate of 1.5% per month. The Court has reviewed Amerisource's interest calculations and the supporting affidavit of Amerisource Regional Director of Credit Deborah Wertz. They appear accurate and contain no apparent errors, nor has RxUSA challenged the methodology or results. <u>See</u> Swartz Aff. Supp Prejudgment Interest Ex. 1–3. Therefore, the Court awards Amerisource prejudgment interest against RxUSA at a rate of 1.5% per month from the various due dates, as specified in Amerisource's calculations, through the date of payment. <u>See</u> <u>id.</u>

**C.** <u>**Litigation Expenses.**</u>

Consistent with the American Rule regarding attorneys' fees, New York law generally requires parties to pay their own litigation expenses unless otherwise authorized by statute or contract. <u>See</u> <u>Equitable Lumber Corp. v. IPA Land Dev. Corp.</u>, 38 N.Y.2d 516, 519–20 (1976). Here, the Terms of Sale state that "[s]hould Amerisource find it necessary to obtain assistance in collecting any past due balances, I/We agree to pay . . . reasonable attorney fees, collection fees, and/or court costs allowable by law." Citing this fee-shifting provision, Amerisource seeks an additional judgment of $2,618,657.51 against RxUSA. This sum represents attorneys' fees, expert fees, and costs expended on all claims raised in this action, including RxUSA's five counterclaims for breach of contract, defamation, antitrust conspiracies, and tortious interference with business relations.

**1.** <u>**Scope of the Fee-shifting Provision.**</u>

"[W]hile parties may agree that attorneys' fees should be included as another form of damages, such contracts must be strictly construed to avoid inferring duties that the parties did not intend to create." <u>Oscar Gruss & Son, Inc. v. Hollander</u>, 337 F.3d 186, 199 (2d Cir. 2003) (<u>citing</u> <u>Hooper Assocs., Ltd. v. AGS Computers, Inc.</u>, 74 N.Y.2d 487, 491 (1989)). "[T]he court

should not infer a party's intention to waive the benefit of the [American Rule] unless the intention to do so is unmistakably clear from the language of the promise." Hooper Assoc., 549 N.Y.S.2d at 492; accord Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005); U.S. Fidelity and Guar. Co. v. Braspetro Oil Serv. Co., 369 F.3d 34, 75 (2d Cir. 2004).

The fees provision in this case is narrowly tailored and unambiguously limits fee-shifting to attorneys' fees and costs expended on "collecting any past due balances" only. In order to collect that balance, Amerisource had to prevail on the price issue. Thus, Amerisource is entitled to fees expended on any claims in which price was a material fact. These include fees expended on both Amerisource's contract claim as well as RxUSA's contract counterclaim. Since RxUSA alleged that it was owed money under its version of the price terms, Amerisource could not have collected the past due balance without prevailing on both contract claims. See Diamond D Enterprises USA, Inc. v. Steinsvaasg, 979 F.2d 14, 18 (2d Cir. 1992) ("[W]here a fee applicant recovers on a claim subject to a contractual attorney's fee provision and in the process litigates a counterclaim on which he must prevail in order to recover on his claim, then the fee applicant is entitled to his attorney's fees for both the claim and the counterclaim.") (internal citations and quotation marks omitted).

Amerisource is also entitled to fees and costs incurred in defending against RxUSA's two tort counterclaims (defamation and tortious interference with business relations). To prevail on those claims, RxUSA had to prove that Amerisource's statements regarding RxUSA's creditworthiness were false. See Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 301 (2d Cir. 1986) (noting that it is well-settled that truth is an absolute defense to defamation and the plaintiff bears the burden of proving the falsity of the allegedly defamatory statement); Don

Buchwald & Associates, Inc. v. Rich, 281 A.D.2d 329, 330 (1st Dep't 2001) ("A necessary element to the claim of tortious interference with economic relations is the use of 'wrongful means' to achieve the end, such as by fraud or misrepresentation."). According to RxUSA, the statements were false because, under RxUSA's version of the contract prices, RxUSA was not in arrears and therefore did not have bad credit. Given RxUSA's theory of the case, there is no scenario under which the fact-finder could find that Amerisource proved its case regarding price, but was nevertheless liable for defamation and tortious interference. Thus, the tort claims were inextricably intertwined with the collection action and are compensable under the contract.

Price was not material to the Sherman and Donnelly Act antitrust counterclaims and Amerisource is not otherwise entitled to fees and costs expended on those claims. RxUSA's antitrust claim alleged that Amerisource and its competitors unlawfully conspired to "carve up the market of large customers" and that vendors agreed not to sell products to buyers not assigned to them. Price was only a factor in these claims to the extent that RxUSA alleged that the conspirators concocted a false explanation regarding RxUSA's lack of creditworthiness as a means to conceal the conspiracy behind their true motive for declining RxUSA's business. This connection is too attenuated to trigger the narrow fee-shifting at issue here. Moreover, how the conspirators concealed the alleged conspiracy was neither a prima facie element nor probative of any defenses.[5] Thus, it is not "unmistakably clear" that the parties intended RxUSA's liability for litigation expenses to extend to disputes so far removed from a basic collection situation as defendants' Sherman and Donnelly Act claims. See, e.g., Jackson v. Oppenheim, 533 F.2d 826,

_____

[5] To establish a violation of § 1 of the Sherman Act, a plaintiff must prove some form of concerted action between at least two legally distinct economic entities and that such conduct constituted an unreasonable restraint of trade. See, e.g., Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95–96 (2d Cir. 1998). To establish a Donnelly Act violation, a plaintiff must: (1) identify the relevant product market; (2) describe the nature and effects of the purported conspiracy; (3) prove how the economic impact of that conspiracy is to restrain trade in the market in question; and (4) show a conspiracy or reciprocal relationship between two or more entities. Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton, 997 F. Supp. 340, 352 (E.D.N.Y. 1998).

831 (2d Cir. 1976) (holding that "language more express than 'costs of collection' should have been employed" to create liability for costs incurred in defending a separate securities law claim regarding validity of the underlying sale transaction).

The cases relied upon by Amerisource are not to the contrary. Both <u>Diamond D</u>, 979 F.2d 14, and <u>Towers Charter & Marine Corp. v. Cadillac Ins. Co.</u>, 894 F.2d 516 (2d Cir. 1990), are distinguishable because the contractual fee-shifting language in those cases was substantially broader than the narrowly tailored language at issue here. <u>See</u> <u>Diamond D</u>, 979 F.2d at 18 (awarding fees on various contract and non-contract claims and counterclaims where the fee-shifting provision entitled the franchisor to attorneys' fees and costs incurred to enforce any obligation or defend against any claim, regardless of which party filed the action); <u>Towers Marine</u>, 894 F.2d at 524–25 (awarding lender fees incurred in connection with borrower's direct action for anticipatory breach and with third-party's interpleader action regarding escrowed loan funds where the contractual fee-shifting provision in the loan documents stated that borrower would be responsible for lender's expenses incurred "in connection with the [l]oan"). Moreover, unlike in <u>Towers Marine</u>, RxUSA did not inject its Sherman and Donnelly Act counterclaims into the contract claims such that Amerisource was required to defend against those claims in order to collect the past due balance. <u>Towers Marine</u>, 894 F.2d at 525.

For the foregoing reasons, the Court finds that the contract entitles Amerisource to fees and costs expended on the its contract claim, as well as on RxUSA's counterclaims for breach of contract, defamation, and tortuous interference with prospective business relations. Amerisource is not entitled to fees and costs expended on RxUSA's Sherman and Donnelly Act counterclaims.

## 2.  **The Attorneys' Fees Award.**

Having determined that the contract authorizes an award of reasonable attorneys' fees for Amerisource's collection expenses, the Court must calculate an appropriate fee award.  <u>See McGuire v. Russell Miller, Inc.</u>, 1 F.3d 1306, 1313 (2d Cir. 1993) (holding that in a fee application based on contract, "the judge determines the amount of attorneys' fees owed . . . after the liability for such fees is decided at a trial, whether bench or jury"); <u>see also</u> <u>GMC v. Villa Marin Chevrolet, Inc.</u>, 240 F. Supp. 2d. 182, 185 (E.D.N.Y. 2002) ("Regardless of whether fees are awarded pursuant to statute or pursuant to contract, the determination of what is a reasonable award is within the sound discretion of the trial court."); <u>Orix Credit Alliance, Inc. v. Grace Indus., Inc.</u>, 261 A.D.2d 521, 521–22 (2d Dep't. 1999) (the court has "the inherent authority to determine reasonable attorneys' fees").

Under both New York and federal law, attorneys' fees are determined by multiplying a reasonable hourly rate by the number of hours reasonably expended to arrive at a presumptively reasonable fee, which may then be adjusted to account for the circumstances of the case.  <u>See F.H. Krear & Co. v. Nineteen Named Trustees</u>, 810 F.2d 1250, 1263 (2d Cir.1987) (describing the "lodestar" method used in New York law); <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany</u>, 493 F.3d 110, 117–18 (2d Cir. 2007) <u>amended on other grounds by</u> 522 F.3d 182 (2d Cir. 2008) (describing the "presumptively reasonable fee" approach endorsed by the Second Circuit); <u>see also</u> <u>Bldg. Serv. 32BJ Health Fund v. Renaissance Equity Holdings</u>, No. 08-CV-9264, 2010 WL 1438117, at *2 (S.D.N.Y. Apr. 9, 2010) (Chin, J.) (<u>quoting</u> <u>Robinson v. City of N.Y.</u>, No. 05-CV-9545, 2009 WL 3109846, at *3 (S.D.N.Y. Sept. 29, 2009) (Lynch, J)).  The presumptively reasonable fee is defined as "what a reasonable, paying client would be

willing to pay," in order to "spend the minimum necessary to litigate the case effectively." Arbor Hill, 493 F. 3d at 112, 118.

### a.  Reasonable Hourly Billing Rate.

The hourly rate generally must be consistent with rates charged within the district in which the reviewing court sits.  See Arbor Hill, 493 F.3d at 119 (quoting In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 232 (2d Cir. 1987)).  To obtain higher out-of-district rates, a fee applicant must persuade the Court "that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result."  Simmons, 575 F.3d at 175.  Courts should apply current, rather than historic, rates in order to account for the delay in payment.  Konits v. Valley Stream Cent. High School Dist., 350 Fed. Appx. 501, 505 n.2 (2d Cir. 2009) (citing LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998)).  In setting the hourly rate, courts must "bear in mind all of the case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorney's fees."  Arbor Hill, 493 F.3d at 117.  The court should consider:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id. at 114 n.3 (quoting Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974)); see also Bankers Federal Sav. Bank FSB v. Off West Broadway Developers, 224 A.D.2d 376, 377 (identifying the same factors).

Amerisource seeks $2,396,881.76 in attorneys' fees[6] for a team of thirty-seven individuals spread across three law firms.[7]  The team consisted of ten partners, one counsel, thirteen associates, twelve paralegals,[8] and one librarian.[9]  Amerisource requests fees that it actually paid over the nine-year course of this ligation, which were based on varying individual hourly rates and the hours expended by each team member.  Certain individuals billed at multiple rates as their rates changed over time.  In support of the fee application, Amerisource submitted nine years of contemporaneous billing records for all thirty-seven individuals as well as the professional biographies of several partners and associates.  According to these records, Amerisource paid hourly rates ranging from $93.75 to $556 for partners, $88.37 to $285 for associates, $85 to $195 for paralegals, and $75 to $125 for the librarian.

RxUSA has not challenged the requested hourly rates.  However, many of the historic rates actually charged to Amerisource exceed the current prevailing rates for legal services in the Eastern District, which range from $300 to $400 for partners, $200 to $300 for senior associates, $100 to $200 for junior associates, and $75 to $90 for paralegals.  See, e.g., Luca v. County of Nassau, No. 04-CV-4898, 2010 WL 307027, at *3–4 (E.D.N.Y. Jan. 25, 2010) (finding $400 for experienced attorney's services reasonable in the Eastern District); Gutman v. Klein, No. 03-CV-

---

[6] This sum represents $1,792,374.86 paid to Klehr, Harrison, Harvey, Branzburg, & Ellers LLP ("Klehr"), see Pl. Mot. for Attorneys' Fees and Costs, Dkt. No. 246 Ex. H-11; $380,911.40 paid to Buchanan Ingersoll & Rooney PC ("Buchanan"), see id. Ex. I-4; and $223,595.50 paid to Drinker Biddle & Reath LLP ("Drinker"), see id. Ex. I-4.

[7] Drinker identified two additional individuals, paralegal Harley Miller and legal assistant Jennifer Jascoll, as having worked on this matter, but they are absent from Drinker's billing summary.  The Court therefore assumes that Amerisource is not requesting fees for work completed by Harley and Jascoll and excludes them from the fee calculation.  Amerisource also requested fees paid to two computer forensics experts and a jury consulting firm.  These non-attorney fees are discussed separately below.

[8] Included among these twelve paralegals are individuals variously identified by Buchanan and Drinker as having provided litigation technology support, legal assistance, or litigation analysis.

[9] Like computer research fees, librarian services are compensable as attorneys' fees because such services save money by making legal research more efficient for attorneys and because paying clients reimburse research expenses, just as they reimburse paralegal expenses.  See Arbor Hill, 369 F.3d at 98 (permitting recovery of computer research fees as attorneys' fees).

1570, 2009 WL 3296072, at *2 (E.D.N.Y. Oct. 13, 2009) (awarding $300-400 for partners, $200-300 for senior associates, and $100-200 for junior associates reasonable in the Eastern District); Century 21 Real Estate LLC v. Bercosa Corp., 666 F. Supp. 2d 274, 299 (E.D.N.Y. 2009) (Gleeson, J.) (Orenstein, M.J.) (awarding rates of $320 to partners, $230 to associates, $100 to law clerks, and $75 to paralegals in an uncontested breach of contract and Lanham Act case). Amerisource, which cites mostly Southern District cases for a legal team based entirely in Philadelphia, did not argue and does not establish on the face of the fee application that it meets this Circuit's standard for higher out-of-district rates. See Simmons, 575 F.3d at 175. Accordingly, some of the requested rates must be reduced.[10]

An assessment of the Johnson factors compels the Court to set the billing rates for the lead attorneys at the highest rates available in the Eastern District. This action involved a complex factual backdrop, which counsel was required to master in order to effectively depose industry insiders and craft a cohesive case. Due to extensive discovery, deposition, and motion practice, counsel were also required to expend significant time and labor. At least one attorney, Paul Nofer, worked on the matter for nearly its entire nine-year lifespan. Additionally, all of the lead attorneys were experienced litigators from respected firms who provided excellent services and obtained a complete victory for their client. Based on these considerations, the Court makes the following adjustments to the requested billing rates.

The highest rates for partners Paul Nofer and Craig Mills, who were the lead attorneys through pre-trial and trial respectively and had the most contact with the Court, are reduced to

---

[10] All but one of the cases that Amerisource cited in support of its rates are from the Southern District of New York and are therefore inapplicable here under the Simmons standard. The one Eastern District case cited, In re Gilat Satellite Networks, Ltd., No. 02-CV-1510, 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2009) (Sifton, J.), noted that rates of up to $725 per hour for partners and $325 per hour for associates were appropriate. However, in that case, which involved a high-risk securities class action taken on contingency, the court awarded attorneys' fees based on a percentage-of-recovery method permissible in class actions and conducted a limited lodestar analysis simply to "cross check" the results of the percentage analysis. Accordingly, it is distinguishable from this case.

$400. The highest rates for partners Morton Branzburg, William Hinchman, and David Kessler, who played active supporting roles, are reduced to $375. The highest rate for partner R. Roisman, whom the Court had no opportunity to observe and for whom no professional biography was submitted, is reduced to $350. The highest rate for associates Rachel Bernstein, Brian Crowley, A. Kristina Littman, and Michael Burg are reduced to $250. The highest rate for paralegal Reeny Kelly, who played an integral role at trial, is pegged to the high end of this district's range and is reduced to $90. The highest rate for all other paralegals and support staff is reduced to $80. The requested rates for the remaining partners and associates are reasonable and RxUSA has not objected to them. Therefore, they will not be adjusted.

### b. **Reasonable Hours Expended.**

In calculating the number of reasonable hours, district courts look to the facts and complexity of the case and take into account their own experience with the case. Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992) (citations omitted). Hours should be examined "with a view to the value of the work product of the specific expenditures to the client's case." Tr. of the Road Carriers Local 707 Welfare Fund v. Goldberg, No. 08-CV-0884, 2009 WL 3497493, at *9 (E.D.N.Y. Oct. 28, 2009) (citations omitted). The fee applicant bears that burden of proving that the hours are reasonable and must produce contemporaneous time records showing the dates, hours expended, and nature of work performed by each attorney. N.Y. State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1148 (1983); Morin v. Nu-Way Plastering Inc., No. CV-03-CV-405, 2005 WL 3470371, at *2–3 (E.D.N.Y. Dec. 19, 2005). Courts should reduce hours where the fee applicant submits deficient or incomplete billing records. See Hensley v. Eckerhart, 461 U.S. 424, 437 n. 12 (1983) (attorneys seeking fee awards must "identify the general subject matter of [their] time expenditures"). Courts may exclude "excessive, redundant

or otherwise unnecessary hours" from the calculation, <u>Quarantino v. Tiffany & Co.</u>, 166 F.3d 422, 425 (2d Cir. 1999), or make an across-the-board reduction in the number of hours. <u>See Luciano v. Olsten Corp.</u>, 109 F.3d 111, 117 (2d Cir. 1997). However, hours should be based not on what appears necessary in hindsight, but on whether "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." <u>Grant v. Martinez</u>, 973 F.2d 96, 99 (2d Cir. 1992).

According to the billing records, the Amerisource team expended a total of 7,644.65 hours on this matter.[11] RxUSA has not objected to the hours. Nevertheless, the Court must ensure their reasonableness. At first blush, the figure may seem excessive due to overstaffing. A total of thirty-seven people, including eight partners from the Klehr firm alone, billed on this matter. However, a close review of the billing records indicates that several of the thirty-seven individuals billed relatively modestly and that the majority of the work was done by a reasonably-sized group of core attorneys and paralegals. Nearly half the team billed fifteen hours or less over nine-years and over one-third of the total hours were billed by a single attorney, Klehr partner Paul Nofer. Accordingly, no reduction for overstaffing is necessary. There are some instances in which attorneys fail to adequately describe their work, which makes it difficult for the Court to determine the necessity and value of the particular time expenditure.[12] However, the substantial majority of the billing entries are adequately detailed and do not appear duplicative or inconsistent with the particular task performed. Accordingly, the hours shall not be reduced for vagueness, excess, or inefficiency.

---

[11] This total represents 5,676.55 hours expended by Klehr, <u>see</u> Dkt. No. 246 Ex. H-11; 1,246 hours expended by Buchanan, <u>see</u> Dkt. No. 246 Ex. I-4; and 722.1 expended by Drinker, <u>see</u> Dkt. No. 246 Ex. J-5.

[12] For example, several entries for Klehr partners Morton Branzburg and Jonathon Bennett fail to identify the subject matter of their meetings and telephone calls. <u>See, e.g.</u>, Dkt. No. 246 Ex. H-11: Klehr Invoice dated May 24, 2001, Klehr Invoice dated May 31, 2003. There are several entries by Librarian Margaret Fallon that simply state "obtain address information." <u>See, e.g., id.</u>: Klehr Invoice dated Mar. 31, 2009.

The total requested hours represent a reasonable expenditure of time given the near decade over which this case has been pending, the need to defend multiple claims in pursuit of the overdue balance, the factually complexity, the extensive motion practice, the voluminous and convoluted discovery, and the lengthy trial. Moreover, in light of RxUSA's sizable counterclaims, it was not unreasonable for Amerisource to pursue its claims and pay legal fees for nine years to collect a relatively paltry principal sum. It is likely that under such circumstances, other sellers would also hold their ground in order to demonstrate to their customers that debts cannot be escaped simply by raising expensive counterclaims and dragging out collection efforts.

Amerisource seeks reimbursement for attorney time expended on non-compensable activity. However, the voluminous billing records do not delineate between the claims and issues to which the expended time should be assessed and it would be too onerous for the Court to cull the non-compensable hours from nine years of records maintained by thirty-seven different people. Therefore, an overall fee reduction, which I discuss below, is a more efficient method of accounting for non-compensable time. See, e.g., U.S. Football League v. National Football League, 887 F.2d 408 (2d Cir. 1989).

### c. Presumptively Reasonable Fee.

Multiplying the reasonable hourly billing rates by the numbers of hours reasonably expended, as established above, yields a total presumptively reasonable fee of $2,280,643.62. The Court's calculations are illustrated on the fee schedule attached as Exhibit A to this Opinion. Though there is a strong presumption in favor of this figure, courts may adjust it to account for any relevant factors that it does not reflect. See Building Service 32BJ Health Fund, 2010 WL 1438117, at *2.

###### d. **Adjustments.**

Because the contract only permits fee-shifting for collection expenditures, the presumptively reasonable fee must be reduced to account for non-compensable activity. RxUSA asserts that the majority of Amerisource's fees were expended on the antitrust claims. However, it provides scant support for this assertion, relying merely on counsel's conclusory unsworn statement and a one-sentence discovery order from 2002. Moreover, neither party made an effort to quantify the value of the time expended on those claims or identify any facts that would aid the Court in calculating an appropriate reduction. The Court therefore must employ a percentage reduction based on its familiarity with the case.

Though the antitrust claims were dismissed on summary judgment motion years ago, the effort and time expended on those claims was not insubstantial. The parties completed full discovery involving numerous depositions and third-party paper discovery in addition to the motion practice itself. The presumptively reasonable fee is reduced by fifteen percent to account for this non-compensable activity. Additionally, a review of the billing records indicates that the fee request includes attorney time spent on sanctions motions and the fee application.[13] Since these motions were not required to collect the past due balances, the presumptively reasonable fee is reduced by an additional ten percent.[14] These adjustments result in a twenty-five percent reduction of the presumptively reasonable fee to $1,710,482.72.

---

[13] For example, Drinker billing entries dated January 9-12, 2009 bill for time spent "[r]esearching law re: fraud upon the court occasion by proffer of falsified documents," "[d]rafting failure to preserve and spoliation of evidence analysis," "[d]rafting discovery abuse analysis," and "[p]roof reading brief for motion for sanctions." Dkt. No. 246 Ex. J-5. An entry by Buchanan dated April 10, 2009 bills for time spent researching billable rates in the Eastern and Southern Districts and another dated July 31, 2009 bills for work on the memorandum of law in support of attorneys' fees. Id. at Ex. I-4.

[14] Fees expended on the attorney fee application must also be excluded under the rule that "a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves." Krear, 810 F.2d at 1266.

RxUSA argues that the fee should be additionally reduced because it is disproportionate to the $275,000 recovered in Amerisource's underlying contract claim. RxUSA correctly cites Krear for the "the general rule in New York" that "it is rarely proper to award fees in an amount that exceeds the amount involved in the litigation." Krear, 810 F.2d at 1250. However, RxUSA's argument is flawed for two reasons. First, a proper calculation of the true amount in controversy relevant to the fee application requires consideration of all claims that Amerisource was required to prevail on in order to collect the past due balance. To hold otherwise would permit RxUSA to use its expensive counterclaims to first frustrate legitimate collection efforts, and then, when that fails, to thwart its contractual obligations. Prejudgment interest must also be included to account for the true value of the collection aspect of this case. Accordingly, the relevant amount in controversy is over $55 million,[15] not $275,000 as asserted by RxUSA.

Additionally, the proportionality standard articulated in Krear is not a per se rule but rather one guidepost of many in determining the reasonableness of a fee award. Accordingly, the Court has the discretion to permit a fee award that exceeds the basic damages value of the case if it is reasonable to do so under the circumstances. See Krear; see also Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005) (noting that "[i]t is . . . difficult to generalize about the appropriate size of the fee in relation to the amount in controversy" because "an attorney is in part reacting to forces beyond the attorney's control, particularly the conduct of opposing counsel and of the court" and "the hours required to litigate even a simple matter can expand enormously"); Kahlil v. Original Old Homestead Restaurant, Inc., 657 F. Supp. 2d 470, 478 (S.D.N.Y. 2009) ("[T]he simple disproportion between a plaintiff's recovery and the fee applied for is not a proper basis for a reduction in an otherwise reasonable fee."); Krumme v.

---

[15] RxUSA claimed over $400,000 in contract damages and over $54 million under the defamation and tortious interference claims. See generally Second Amended Counterclaims.

<u>Westpoint Stevens Inc.</u>, 79 F. Supp. 2d 297 (S.D.N.Y. 1999) (noting that "there is no bright-line rule-even with regard to the amount in controversy-for the calculation of reasonable attorneys' fees" and that New York case law "explicitly states that there are circumstances where reasonable attorneys' fees can exceed the amount in controversy.").

In this case, the sheer length of the litigation, nine years, is a sufficiently unusual circumstance to warrant a departure from the proportionality rule. Moreover, the seemingly straightforward, single-issue nature of the contract claims belies the voluminous discovery and complex factual backdrop of pricing in the pharmaceutical industry. Finally, the adjusted presumptively reasonable fee is also proper because it is based on attorney time actually and reasonably expended and paid for by Amerisource. It is unlikely that Amerisource would have agreed to a different fee arrangement, such as a contingency fee, even if there had been no fee-shifting agreement. Thus, the award is consistent with the "principle that a contractual fee award should approximate the fee arrangement that would have been made absent the fee-shifting provision." <u>In Time Products, Ltd. v. Toy Biz, Inc.</u>, 38 F.3d 660, 668 (2d Cir. 1994). There is no evidence that Amerisource intentionally manipulated its litigation expenses to take advantage of the fee-shifting agreement. Accordingly, the fee will not be adjusted to the past due balance.

### 3. <u>Costs.</u>

In addition to attorneys' fees, Amerisource seeks $127,750.67[16] in costs for a variety of routine items such as filing, photocopying, postage, telephone, travel, and meals. These costs, to which RxUSA has not specifically objected, are reasonable and generally compensable under the Terms of Sale, which explicitly entitle Amerisource to "court costs" incurred in collecting the

---

[16] This includes $81,754.15 in costs incurred by Klehr, $19,561.72 in costs incurred by Buchanan, and $26,434.80 in costs incurred by Drinker. <u>See</u> Dkt. No. 246 Ex. K.

past due balance.[17]  See, e.g., ATC Healthcare Servs., Inc. v. Personnel Solutions, Inc., No. 01-CV-762, 2007 WL 1893205 at *4 (S.D.N.Y. June 29, 2007) (awarding such costs under contractual attorneys' fee provision); Brigiotta's Farmland Produce & Garden Ctr., Inc. v. Przykuta, Inc., No. 05-CV-273, 2006 WL 3240729 at *9 (W.D.N.Y. July 13, 2006) (same); Ursa Minor Ltd. v. Aon Fin. Prods., Inc., No. 00-CV-2474, 2001 WL 1842042 at *9 (S.D.N.Y. May 30, 2001) (same).  However, to discount for costs associated with non-collection activity, which, as discussed above, is not compensable under the parties' agreement, the Court reduces the cost request by twenty-five percent for a total contractual cost award of $95,813.00.

### 4. Expert Fees.

Amerisource also requests $146,787.83 in expert fees.[18]  However, there is no basis for an award for expert fees.  Expert fees are not specifically compensable under the Collection Provision, which limits liability for litigation expenses to attorneys' fees, court costs, and collection fees only.   Additionally, none of these three enumerated categories can be reasonably interpreted to encompass expert fees.  See Arlington Cent. School Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 303 (2006) (noting that the term "attorneys' fees," standing alone, is generally not understood as encompassing expert fees).  Thus, it is not "unmistakably clear" that the parties contemplated liability for expert fees.

Additionally, even if expert fees were generally available under the contract, they could not be awarded here because they were not necessary to collecting the past due balance and were

---

[17] These items are largely consistent with the taxable costs enumerated in Local Civil Rule 54.1(c) and 18 U.S.C. 1920. While those statutory rules do not govern the costs award here because the costs are sought as damages pursuant to a controlling contractual provision, see, e.g., Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Finance Corp., No. 04-CV-3854, 2008 WL 4833025, at *9 (S.D.N.Y. Nov. 3, 2008), they are relevant to the extent that they reveal the ordinary and plain meaning of the term "court costs," which this Court must interpret in order to enforce the parties' agreement.

[18] This includes $45,291.12 in fees and costs paid to LECG, $91,209.52 in fees and costs paid to DOAR, and $10,287.19 in fees and costs paid to NERA.  Dkt. No. 246 Ex. K.

not reasonable expenses given the circumstances of this case. The NERA team billed a total of $10,287.19 in fees and costs. It consisted of two individuals, Alexander Stein and Jesse David, who provided services between September 2005 and June 2006. Stein charged $145 per hour and David charge $425 and $450 per hour. Amerisource did not provide a description of their services and their billing records are very vague, but it appears that they had some involvement with electronic discovery. Among other things, David billed $3,600 for attending a deposition, but failed to identify the deponent or the subject matter. No one from NERA testified at trial and it is not apparent from the fee application exactly how, if it at all, NERA furthered Amerisource's collection efforts.

Amerisource seeks $45,291.12 in fees and costs for James Vaughn, an electronic discovery expert who was "hired to conduct forensic analysis and provide expert opinion with respect to" electronic discovery regarding Exhibit OO. However, Vaughn's forensic investigation, which took place after the original trial date was abruptly adjourned just days before it was scheduled to commence, yielded little regarding Exhibit OO and Amerisource largely abandoned its attack on the authenticity of Exhibit OO by the time of trial. Indeed, Exhibit OO ultimately played only a minor role in the overall case. The Exhibit OO investigation happened to uncover substantial damning evidence regarding the authenticity of the WAC-15% emails, which were integral to RxUSA's case and which enabled RxUSA to survive summary judgment. This new evidence was extremely helpful to Amerisource to the extent that it caused RxUSA to admit that the emails were fabrications and withdraw them from its case. However, Amerisource had asserted that the WAC-15 emails were suspect several years prior to the Exhibit OO investigation and had evidence to successfully attack their authenticity at trial even without the benefit of the supplemental discovery.

Amerisource's expenditures on litigation and jury experts were even more unnecessary and are additionally non-compensable because they exceed the minimum that a reasonable paying client would pay absent a fee-shifting arrangement. See <u>Arbor Hill</u>, at 112, 118. The eight DOAR experts billed a total of $96,209.52 in fees and costs and charged between $225 and $295 per hour. Amerisource's fee application provides no description of the services DOAR provided but the contemporaneous time records suggest that DOAR facilitated the impressive evidence presentation system that Amerisource used during trial and also conducted jury research prior to the trial. The DOAR billing records include several entries for the creation of "graphics concepts," "animations," and "database preparation." Their list of itemized costs includes $35,000 for a jury focus group and $13,500 for juror "incentives" and "recruitment." It would be unreasonable to hold RxUSA accountable for such premium services, which far exceed the standard litigation expenses of the average reasonable litigant.

## IV. CONCLUSION

The Court finds that a contract existed between the parties, that the defendants breached the contract, and that defendants' breach entitles plaintiff to the past due balances, prejudgment interest, and certain contractual attorneys' fees and costs. Therefore, it is hereby ORDERED that the Clerk of the Court enter judgment against the defendants in accordance with the following:

> judgment against defendant Rx USA International, Inc. in the principal sum of $175,718.26, prejudgment interest of $480,738.65 through September 9, 2009, and additional prejudgment accruing at a rate of 1.5% per month from September 10 through the date of judgment;

> judgment against defendants Parsons Medical Center Pharmacy Inc., and Parsons Medical Center Pharmacy Inc. (II), jointly and severally, in the principal sum of $99,709.01, prejudgment interest of $267,896.40 through September 9, 2009, and additional prejudgment interest accruing at a rate of 1.5% per month from September 10, 2009 through the date of judgment; and

> judgment against each defendant, jointly and severally, in the sum of

$1,806,295.72 in attorneys' fees and costs.

It is further ORDERED that defendants' counterclaim for breach of contract be dismissed in their entirety and that defendants take nothing of plaintiff.

SO ORDERED.

Dated:  May 26, 2010
        Brooklyn, New York

_____/s/_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

# Exhibit A

| TIMEKEEPER | DATE reflecting change in rate | RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| A TABASSO | 8/27/2001 | $ 190.00 | 0.30 | $ 57.00 |
| | | | | |
| D MARKOWITZ | 7/31/2001 | $ 102.32 | 3.25 | $ 332.54 |
| D MARKOWITZ | 7/31/2001 | $ 190.00 | 65.25 | $ 12,397.50 |
| D MARKOWITZ | 8/27/2001 | $ 190.00 | 14.00 | $ 2,660.00 |
| D MARKOWITZ | | | 82.50 | $ 15,390.04 |
| | | | | |
| G WEINER | 3/31/2009 | $ 345.00 | 1.00 | $ 345.00 |
| | | | | |
| J BENNETT | | $ 250.00 | 22.60 | $ 5,650.00 |
| J BENNETT | 7/31/2001* | $ 250.00 | 32.50 | $ 8,125.00 |
| J BENNETT | 7/31/2001* | $ 178.58 | 5.60 | $ 1,000.05 |
| J BENNETT | 7/31/2001* | $ 93.75 | 1.60 | $ 150.00 |
| J BENNETT | 8/27/2001* | $ 250.00 | 254.05 | $ 63,512.50 |
| J BENNETT | | | 316.35 | $ 78,437.55 |
| | | | | |
| J EBNER | | $ 190.00 | 5.00 | $ 600.00 | 900.00 |
| | | | | |
| J GIBBONS | | 190.00 | 15.60 | $ 2,964.00 |
| | | | | |
| J KINKOPF | | 190.00 | 2.80 | $ 532.00 |
| | | | | |
| J TAYLOR | | $ 100.00 | 1.70 | $ 270.00 | 376.00 |
| | | | | |
| K CARTON | 2/27/2002 | $ 190.00 | 12.40 | $ 2,356.00 |
| K CARTON | 3/27/2002 | $ 190.00 | 18.80 | $ 3,572.00 |
| K CARTON | 3/27/2002 | $ 88.37 | 8.60 | $ 760.00 |
| K CARTON | | | 39.80 | $ 6,688.00 |
| | | | | |
| L COLLINS | | $ 235.00 | 272.60 | $ 64,061.00 |
| L COLLINS | 3/22/2006* | $ 245.00 | 304.10 | $ 74,504.50 |
| L COLLINS | 2/29/2008* | $ 270.00 | 457.45 | $ 123,511.50 |
| L COLLINS | 11/30/2008* | $ 300.00 | 33.50 | $ 10,050.00 |
| L COLLINS | 3/31/2009* | $ 270.00 | 57.20 | $ 15,444.00 |
| L COLLINS | | | 1124.85 | $ 287,571.00 |
| | | | | |
| L SHARKEY | | $ 145.00 | 1.00 | $ 145.00 | 80.00 |
| | | | | |
| M BRANZBURG | | $ 325.00 | 4.75 | $ 1,543.75 |
| M BRANZBURG | 11/18/2002* | $ 360.00 | 3.05 | $ 1,098.00 |
| M BRANZBURG | 11/21/2003* | $ 288.00 | 0.50 | $ 144.00 |
| M BRANZBURG | 12/18/2003* | $ 324.00 | 0.25 | $ 81.00 |
| M BRANZBURG | 5/24/2004* | $ 375 385.00 | 0.60 | $ 231.00 |
| M BRANZBURG | 5/23/2005* | $ 375 410.00 | 1.50 | $ 615.00 |
| M BRANZBURG | 4/28/2006* | $ 375 440.00 | 3.30 | $ 1,452.00 |
| M BRANZBURG | 2/29/2008* | $ 375 500.00 | 14.40 | $ 7,200.00 |
| M BRANZBURG | 12/31/2008* | $ 375 556.00 | 0.10 | $ 55.60 |
| M BRANZBURG | 1/30/2009* | $ - | 0.70 | $ - |
| M BRANZBURG | 3/31/2009* | $ 375 500.00 | 29.70 | $ 14,850.00 |
| M BRANZBURG | | | 58.85 | $ 27,270.35 |

19,562.50

21,739.25

EXHIBIT 11                                                    Klehr Fees Summary

| TIMEKEEPER | DATE reflecting change in rate | RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| M FALLON | | $ ~~125.00~~ *80* | 2.85 | $ ~~356.25~~ *228.00* |
| M FALLON | 8/29/2008* | $ 75.00 | 2.50 | $ 187.50 |
| M FALLON | | | 5.35 | $ *~~542.75~~* |
| M ROSENBERG | 10/7/2008 | $ 240.00 | 1.90 | $ 456.00 |
| M STOFMAN | 5/24/2001 | $ 190.00 | 6.20 | $ 1,178.00 |
| N YACKLE | | $ ~~85.00~~ *80* | 10.70 | $ ~~909.50~~ |
| N YACKLE | 10/31/2004* | $ ~~115.00~~ *80* | 0.20 | $ ~~23.00~~ |
| N YACKLE | | | 10.90 | $ ~~932.50~~ |
| P NOFER | 5/28/2003 | $ 260.00 | 1.50 | $ 390.00 |
| P NOFER | 10/27/2003 | $ 260.00 | 11.40 | $ 2,964.00 |
| P NOFER | 10/27/2003* | $ - | 8.60 | $ - |
| P NOFER | 11/21/2003* | $ 208.00 | 68.25 | $ 14,196.00 |
| P NOFER | 12/18/2003* | $ 234.00 | 66.60 | $ 15,584.40 |
| P NOFER | 1/26/2004* | $ 221.00 | 37.00 | $ 8,177.00 |
| P NOFER | 1/26/2004* | $ 220.90 | 1.80 | $ 397.62 |
| P NOFER | 2/26/2004* | $ 234.00 | 29.70 | $ 6,949.80 |
| P NOFER | 3/19/2004* | $ 315.00 | 301.05 | $ 94,830.75 |
| P NOFER | 3/28/2005* | $ 335.00 | 342.60 | $ 114,771.00 |
| P NOFER | 2/28/2006* | $ 350.00 | 333.70 | $ 116,795.00 |
| P NOFER | 10/31/2007* | $ 375.00 | 50.20 | $ 18,825.00 |
| P NOFER | 2/29/2008* | $ 400.00 | 791.00 | $ 316,400.00 |
| P NOFER | 11/30/2008* | $ ~~444.40~~ *400* | 245.10 | $ ~~108,824.40~~ *98,040.00* |
| P NOFER | 3/31/2009* | $ 400.00 | 375.70 | $ 150,280.00 |
| P NOFER | | | 2664.20 | $ *~~768,600.57~~* |
| P WERTZBERGER | 3/27/2002 | $ 190.00 | 53.30 | $ 10,127.00 |
| P WERTZBERGER | 11/18/2002* | $ 195.00 | 172.70 | $ 33,676.50 |
| P WERTZBERGER | 11/21/2003* | $ 156.00 | 27.70 | $ 4,321.20 |
| P WERTZBERGER | 12/18/2003* | $ 175.52 | 0.75 | $ 131.64 |
| P WERTZBERGER | 12/18/2003* | $ 175.50 | 28.70 | $ 5,036.85 |
| P WERTZBERGER | 12/18/2003 | $ 175.50 | 8.20 | $ 1,439.10 |
| P WERTZBERGER | 12/18/2003* | $ 175.47 | 1.00 | $ 175.47 |
| P WERTZBERGER | 1/26/2004* | $ 165.80 | 1.50 | $ 248.70 |
| P WERTZBERGER | 1/26/2004* | $ 165.77 | 2.40 | $ 397.85 |
| P WERTZBERGER | 1/26/2004* | $ 165.76 | 7.05 | $ 1,168.61 |
| P WERTZBERGER | 1/26/2004* | $ 165.75 | 41.50 | $ 6,878.63 |
| P WERTZBERGER | 2/26/2004* | $ 175.52 | 0.50 | $ 87.76 |
| P WERTZBERGER | 2/26/2004* | $ 175.50 | 39.25 | $ 6,888.38 |
| P WERTZBERGER | 2/26/2004* | $ 175.30 | 0.10 | $ 17.53 |
| P WERTZBERGER | 3/19/2004* | $ 210.00 | 107.15 | $ 22,501.50 |
| P WERTZBERGER | | | 491.80 | $ 93,086.71 |

Handwritten annotations: 415.50 ; 872.00 ; 98,040.00 ; 758,600.57

EXHIBIT 11

Klehr Fees Summary

| TIMEKEEPER | DATE reflecting change in rate | RATE | HOURS | AMOUNT | |
|---|---|---|---|---|---|
| R BERNSTEIN | | $ 250 ~~280.00~~ | 93.10 | $ ~~26,068.00~~ | 23,275.00 |
| R BERNSTEIN | 3/31/2009* | $ 240.00 | 2.70 | $ 648.00 | |
| R BERNSTEIN | | | 95.80 | $ | 23,923.00 |
| | | | | | |
| W HINCHMAN | | $ 375.00 | 587.50 | $ 220,312.50 | |
| W HINCHMAN | 11/30/2008* | $ 375 ~~417.00~~ | 113.50 | $ ~~47,329.50~~ | 42,562.50 |
| W HINCHMAN | 3/31/2009* | $ 375.00 | 2.40 | $ 900.00 | |
| W HINCHMAN | | | 703.40 | $ | 263,775.50 |
| A HAHN | | $ 80 | 7.75 | $ | 620.00 |
| B CROWLEY | | $ 250 | 36.00 | $ | 9000.00 |
| R ROISMAN | | $ 350 | 0.50 | $ | 175.00 |
| | | | 5676.55 | $ ~~1,792,374.80~~ | 1,770,381.62 |

NOTE: The professional rates for the Klehr firm change throughout the life of this matter.
Therefore we are including the date column as a point of reference for the fluctuating rates, if relevant.
The asterisk(*) designates a month when the rate changed.

EXHIBIT 11                                                                 Klehr Fees Summary

| TIMEKEEPER | RATE | HOURS | AMOUNT | |
|---|---|---|---|---|
| C. D. Mills | $400 ~~495.00~~ | 260.5 | $ ~~128,947.50~~ | > 209,400.00 |
| C. D. Mills | $400 ~~421.00~~ * | 263.0 | $ ~~110,723.00~~ | |
| J. Spiker | $     235.00 | 123.7 | $     29,069.50 | |
| J. Spiker | $     200.00 * | 92.4 | $     18,480.00 | |
| P. Casey | $     235.00 | 56.3 | $     13,230.50 | |
| P. Casey | $     200.00 * | 39.3 | $     7,860.00 | |
| R. Kelly | $ 90 ~~195.00~~ | 151.6 | $ ~~29,562.00~~ | > 36,855.00 |
| R. Kelly | $ 90 ~~166.00~~ * | 257.9 | $ ~~42,811.40~~ | |
| K. La Croix | $ 80 ~~175.00~~ | 1.3 | $ ~~227.50~~ | 104.00 |
| | | | | |
| **TOTALS** | | **1246.0** | $ ~~380,911.40~~ | 314,999.00 |

*New discounted rates effective 1/17/09

**Buchanan Fees Summary through 8/6/09**

| TIMEKEEPER | RATE | HOURS | AMOUNT | |
|---|---|---|---|---|
| DJ KESSLER | $ 375 ~~435.00~~ | 265.80 | $ ~~115,623.00~~ | 99,675.00 |
| AK LITTMAN | $ 250 ~~285.00~~ | 41.50 | $ ~~11,827.50~~ | 10,375.00 |
| MJ BURG, JR. | $ 250 ~~260.00~~ | 244.90 | $ ~~63,674.00~~ | 63,150.00 |
| MJ BURG, JR. | $ 250 ~~280.00~~ * | 3.70 | $ ~~1,036.00~~ | |
| RA HUNTER | $ 245.00 | 59.80 | $ 14,651.00 | |
| CJ KELLY | $ 80 ~~185.00~~ | 18.60 | $ ~~3,441.00~~ | 1488.00 |
| T CHENG | $ 80 ~~170.00~~ | 25.80 | $ ~~4,386.00~~ | 2064.00 |
| GM POWELL | $ 80 ~~150.00~~ | 52.20 | $ ~~7,830.00~~ | 4176.00 |
| JA HORST-MARTZ | $ 80 ~~115.00~~ | 0.80 | $ ~~92.00~~ | 64.00 |
| K LENGEL | $ 80 ~~115.00~~ | 9.00 | $ ~~1,035.00~~ | 720.00 |
| | | | | |
| **TOTALS** | | 722.10 | $ ~~223,595.50~~ | 195,363.00 |

*New rate effective Feb. 2009.

EXHIBIT 5                                   Drinker Fees Summary through 8/10/09