UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
AMERISOURCE CORPORATION,

                Plaintiff,

    -against-                                    **MEMORANDUM & ORDER**

RX USA INTERNATIONAL INC., PARSONS
MEDICAL CENTER PHARMACY INC., and PARSONS    02-CV-2514 (JMA)
MEDICAL CENTER PHARMACY INC. (II)

                Defendants.
----------------------------------------------------------------------X

A P P E A R A N C E S:

Craig D. Mills
Buchanan Ingersoll, & Rooney PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103
    *Attorney for Plaintiff*

Michael L. Levine
The Law Firm of Michael Levine
15 Barclay Road
Scarsdale, NY 10583
    *Attorney for Defendants*

**AZRACK, J., United States Magistrate Judge:**

       Now before the Court is a motion for sanctions by plaintiff Amerisource Corporation ("Amerisource") against the corporate defendants (collectively "RxUSA") and their nonparty principal Robert Drucker ("Drucker"). Amerisource alleges that Drucker fabricated evidence, gave false and misleading testimony, and failed to correct discovery responses throughout the course of the parties' nine-year, multi-million-dollar litigation alleging breach of contract, business torts, and antitrust violations. The parties briefed the issues and the Court received evidence and testimony at a hearing held on September 21, 2009. For the reasons discussed

1

below, plaintiff's motion is granted and the Court sanctions RxUSA and Drucker, jointly and severally, in the amount of $50,000 payable to Amerisource and an additional $50,000 payable to the Clerk of this Court.

## I. BACKGROUND & FINDINGS OF FACT

Familiarity with the facts is presumed. Only the facts proven at the hearing and necessary to the resolution of this motion shall be recounted here.

### A. The Underlying Litigation

RxUSA began purchasing inventory for its wholesale and retail pharmacies from Amerisource in the summer of 1999. After a few months, a heated price dispute arose and each party claimed that the other owed it several hundred thousand dollars. Despite their efforts, including an exchange of demand letters through attorneys, the parties were unable to resolve the dispute and the above-captioned action ensued.

Amerisource sued in June 2001, alleging breach of contract based on RxUSA's failure to pay past due invoices totaling over $275,000. RxUSA promptly counterclaimed for breach of contract, alleging that Amerisource had overcharged RxUSA and failed to honor various verbal discounts promised by Amerisource sales representative Wilfredo LaFontaine ("LaFontaine"). RxUSA claimed that Amerisource owed it over $400,000 under the contract and raised several additional related tort and antitrust counterclaims for over $60 million in damages. Aside from the antitrust claims, which were dismissed on summary judgment, the key to the parties' dispute was price; whoever prevailed on price would prevail overall. Amerisource asserted that the negotiated contract price was WAC-0% on all products, whereas RxUSA agreed that WAC-0% was the base price, but claimed that the contract included several additional verbal discounts.

2

RxUSA's largest claimed discount was a WAC-15% discount on insulin products, which would have resulted in a savings to RxUSA of several hundred thousand dollars.

The action concluded in a complete success for Amerisource. RxUSA's antitrust and defamation counterclaims were dismissed or withdrawn before trial and the contract and tort claims that proceeded to trial were all decided in favor of Amerisource. After a bench trial on the contract claims, the Court found, among other things, that the parties' contract did not include a WAC-15% insulin discount and awarded Amerisource over $1.8 million in damages, prejudgment interest, and contractual attorneys' fees and costs.

**B. <u>The Fabricated Emails</u>**

Amerisource seeks sanctions against Drucker and RxUSA for creating and using four fake emails[1] to support their WAC-15% insulin discount claim. The fake emails were created by inserting WAC-15% language into authentic emails that had actually been exchanged between Drucker and LaFontaine in October and November 1999. The authentic emails had almost no probative value. However, as altered they provided the sole written corroboration of RxUSA's most valuable factual claim. Drucker denies creating the altered emails and asserts that he did not know they were fabricated when he relied upon them during discovery and motion practice and when he verified their authenticity at depositions. He admits that he eventually realized they were fake in March 2004, but he did not inform Amerisource or the Court because he believed he had no obligation to do so. Hr'g Tr. 189, 193.

**C. <u>RxUSA's Use of the Fabricated Emails</u>**

The altered emails first appeared one year before Amerisource commenced this action. On May 23, 2000, former Amerisource counsel Robin London-Zeitz ("London-Zeitz") of Frey

---

[1] Unless otherwise indicated, the word "emails" as used in this Opinion refers to a physical document rather than electronic data.

3

Patrakis Deeb & Blum ("FPD&B") mailed a letter to Drucker regarding RxUSA's past due accounts. Drucker instructed his then-attorney, Leonard Spielberg ("Spielberg"), to draft a response based on information and documents that Drucker would provide. Hr'g Tr. 22–23, 25, 28, 34–35. Versions of the altered emails bearing Drucker's fax header indicate that Drucker faxed the altered emails, along with other documents, to Spielberg at 11:35 a.m. on May 26, 2000. Hr'g Ex. 1. The Drucker fax header versions also bear an "rxusal" insignia in the upper left corner, which, according to Amerisource's computer forensics expert, indicates that they were printed from a computer on the RxUSA network. Id.; Hr'g Tr. 83–86.

Upon receiving the documents from Drucker, Spielberg drafted a demand letter stating that RxUSA had "a net credit balance as against" Amerisource and that "a summary statement" and "a copy of one e-mail substantiating [RxUSA's] claim" were enclosed. Hr'g Ex. 1. In actuality, the letter enclosed two charts and five emails, including all four of the altered emails. Spielberg mailed the demand letter and altered emails to London-Zeitz via regular mail. London-Zeitz received the letter and all enclosures bearing the Drucker fax header on May 30, 2000. Pl.'s Renewed Motion for Sanctions Ex. H ("Pl. Mot."). She faxed everything to Amerisource credit manager Debra Wertz ("Wertz") on June 7, 2000 and filed away her copies. Id. at Ex. I; Aff. of Michelle C. Fullam, Jan. 14, 2009, ¶7 ("Pl. Mot. Ex. K"); Hr'g Tr. 61–63.

The versions of the altered emails that Wertz received via fax from London-Zeitz were stamped at the bottom with an FPD&B fax header indicating that they were faxed from FPD&B to Amerisource at 4:00 PM on June 7, 2000. Pl. Mot. Ex. I. These versions do not bear Drucker's fax header. Amerisource speculates that when London-Zeitz faxed the documents she received from Spielberg to Wertz, the fax machine cut the Drucker fax header off the top and added the FPD&B fax header to the bottom. Pl. Mot. 6. Amerisource then produced the

FPD&B fax header versions during initial discovery while the Drucker fax header versions remained filed away in FPD&B's archives until 2009, when Amerisource asked FPD&B to retrieve them for the trial. Pl. Mot. Ex. K ¶ 4–6; Hr'g Tr. 61–63.

The altered emails made their next significant appearance in 2002 when Amerisource moved for partial summary judgment. To defeat the motion, RxUSA argued that there were material factual disputes regarding price and submitted a sworn affidavit from Drucker dated August 22, 2002. Pl. Mot. Ex. L. In the affidavit, Drucker cited WAC-15% language from one of the altered emails and attached as an exhibit the FPD&B fax header version of that email, as produced by Amerisource. Id. ¶ 37. On February 22, 2005, the Honorable Dora L. Irizarry, the then-presiding District Judge, denied summary judgment because RxUSA "offered specific evidence including: (1) an affidavit from [d]efendants' president explaining the common industry practice regarding pricing and (2) correspondence between plaintiff and [d]efendant and between plaintiff and plaintiff's sales representative, which, if found credible, suggest that plaintiff did in fact promise [d]efendants certain discounts." Pl. Mot. Ex. M at 2–3.

On March 27, 2003, RxUSA relied on the altered emails again. In response to an interrogatory requesting all facts evidencing RxUSA's claimed discounts, RxUSA's stated that LaFontaine had confirmed the agreement orally and by email and cited all four altered emails. Drucker verified and signed this response. Pl. Mot. Ex. N at 5. In response to a demand for all documents supporting the claim, RxUSA produced multiple versions of all four altered emails. Pl. Mot. 8. Among these was a version that bears a Paperport stamp dated May 26, 2000. Id.; Pl. Mot. Ex. D. Drucker testified that the Paperport stamp indicates that Drucker had possession of the document and scanned it into his computer using the Paperport software on the date

5

indicated. Hr'g Tr. 142. The Paperport versions are also marked with the rxusal insignia. They do not bear Drucker's fax header.

RxUSA's March 2003 production of the altered emails was not a remarkable event by itself because Amerisource already received the altered versions by fax from FPD&B in June 2000. However, RxUSA also made its first and only production of the authentic emails at the same time. Pl. Mot. Ex. B, E–G. As noted above, but for the WAC-15% language, the authentic and altered emails were identical in every way, including the time stamp indicating the date and time the email was sent or received. Since, as the parties agree, it is impossible for the same email account to send two different emails to the same address at the same exact time, Amerisource realized that something was amiss.

Amerisource confronted Drucker with the anomaly at his first deposition on February 23, 2004. Amerisource's counsel presented Drucker with the authentic and altered versions of one of the four emails. After Drucker verified both as authentic, Amerisource counsel asked him to explain how two emails sent at the same time could have such different text. Drucker speculated that perhaps he had sent one email within the same minute as the other. Pl. Mot. Ex. P. During a second deposition conducted eight days later on March 2, 2004, Amerisource presented Drucker with another altered email. Drucker confirmed that he received the altered email from LaFontaine. Counsel then presented Drucker with the authentic version of that same email and asked Drucker to explain the anomaly. This time, Drucker stated that he could not explain why the emails were different. Pl. Mot. Ex. Q.

Drucker testified that it was at this moment in March 2004 that he first realized that the altered emails were fabricated. Hr'g Tr. 168–74. However, he did not share the revelation with Amerisource or the Court until several years later. When asked at the hearing what he did upon

realizing that evidence had been fabricated, Drucker stated "I am sure I spoke to – would have spoken to my attorney . . . ." Id. at 168. He took no other action to rectify the situation. Id. at 176–78.

In September 2006, Amerisource moved for summary judgment a second time and challenged the authenticity of the four altered emails in its supporting brief. Pl. Mot. Ex. R at 11–12. RxUSA ignored the allegation and made no mention of the altered emails in its opposing papers. Pl. Mot. Ex. S. On September 20, 2007, Judge Irizarry denied the motion on other grounds. Ex. T at 11–14. The case was later transferred to the undersigned on consent of all parties and trial was set for September 8, 2008.

On August 28, 2008, the parties filed a joint pre-trial order in which RxUSA designated three of the four altered emails as trial exhibits. Ex. U(B) However, five days before trial, a dispute arose over the propriety of a different RxUSA trial exhibit, Exhibit OO. The Court adjourned the trial to January 26, 2009 and permitted Amerisource to conduct supplemental electronic discovery to investigate the authenticity of Exhibit OO and re-depose Drucker.

After collecting a vast amount of computer data, which uncovered no electronic trace of the four altered emails, Amerisource deposed Drucker a final time on January 8, 2009. At that deposition, Drucker testified for the first time that the altered emails were fabricated. Pl. Mot. Ex. A at 388–89, 399–400. However, he denied creating them and speculated that London-Zeitz may have created them back in 2000 after she received them in the mail from Spielberg. Id. at 398.[2] Thereafter, RxUSA withdrew the altered emails from its list of trial exhibits and did not

---

[2] The January 2009 deposition pages attached as Exhibit A to Plaintiff's Renewed Motion for Sanctions do not include page 398 of the transcript. However Amerisource submitted the entire deposition transcript to the Court in connection with its original sanctions motions, which was filed under seal on January 15, 2009. The Court was therefore able to review the relevant sections of the transcription despite the inadvertent omission.

7

rely upon them at trial. Pl. Mot. Ex. Y. During the trial, Drucker testified under oath that he did not create the altered emails and had no knowledge of who did. Trial Tr. 190–98.

## II. DISCUSSION

Amerisource seeks sanctions against RxUSA and Drucker, jointly and severally, pursuant to both the Court's inherent power and Federal Rule of Civil Procedure 37. It seeks an award of $2,798,032.11, its entire cost of litigation, for the "nine-year odyssey" that Drucker and RxUSA "created and kept alive by the sham documents that Drucker forged in May 2000." Drucker and RxUSA acknowledge that the emails containing WAC-15% language are fake, but deny creating or knowingly using the false evidence. They further assert that sanctions are not warranted because there is no "nexus between the alleged modification of documents and any legal fees or costs incurred by [Amerisource] in this case" and that the "fees and costs incurred by Amerisource would have been incurred whether or not the subject documents existed."

### A. The Court's Inherent Power to Sanction

By their very creation, courts are vested with the inherent power to sanction parties who abuse the judicial process or perpetrate fraud upon the court. Chambers v. NASCO, Inc., 501 U.S. 32, 43–44 (1991). A fraud on the court occurs "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process" in an attempt to "hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." McMunn v. Mem'l Sloan-Kettering Cancer Ctr., 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) (quoting Skywark v. Isaacson, No. 96-CV-2815, 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999). Several courts have found that the repeated submission of fabricated evidence constitutes a fraud on the court. See, e.g., Jung v. Neschis, No. 01-CV-6993, 2009 WL 762835, at *15 (S.D.N.Y. Mar. 23, 2009); Hargrove v. Riley, No. 04-CV-4587, 2007 WL

389003, at *11 (E.D.N.Y. Jan. 31, 2007); Shangold v. Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *3 (S.D.N.Y. Jan. 12, 2006); Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002); McMunn, 191 F. Supp. at 446.

The Court's inherent power to sanction litigation misconduct is potent. Chambers, 501 U.S. at 44; DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 136 (2d Cir. 1998). It reaches conduct both before the court and beyond the court's confines and authorizes the court to fashion sanctions as severe as dismissing claims and imposing attorneys' fees for the entire cost of the litigation. Chambers, 501 U.S. at 56–57; Hargrove, 2007 WL 389003, at *11 ("If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process.") (citing Shangold, 2006 WL 71672, at *4). "Because of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. 44 (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)). Sanctionable conduct must be proven by clear and convincing evidence and the district court must make a specific finding of bad faith. DLC Mgmt. Corp., 163 F.3d at 136 (citing United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991)). The court must also make specific factual findings and identify the particular misconduct it deems sanctionable. See MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 73 F.3d 1253, 1262 (2d Cir. 1996) (finding that when imposing sanctions pursuant to Rule 11 and 28 U.S.C. § 1927, a court "must do so with care, specificity, and attention to the sources of its power"); Int'l Bhd. of Teamsters, 948 F.2d at 1346; Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986).[3]

---

[3] Amerisource also requests sanctions pursuant to Federal Rule of Civil Procedure 37 for Drucker's failure to correct discovery responses and deposition testimony after March 2004, the date Drucker claims he first realized the altered emails were fabricated. Rule 37 authorizes courts to sanction parties who fail to correct materially inaccurate discovery disclosures and responses required by Rule 26(e). Fed. R. Civ. P. 37(c). However, because the Court finds, for the reasons discussed below, that Drucker created the documents and knew they were false when he relied upon them prior to March 2004, the misconduct at issue here is broader than a Rule 37 violation. Accordingly, the Court's inherent power is a more appropriate basis for sanctions. Chambers, 501 U.S. at 50 (holding that if the court

B. **Authority to Sanction a Nonparty**

The Court's power to sanction parties appearing before it, such as RxUSA, is well-settled. Chambers, 504 U.S. at 32; Cerruti 1881 S.A. v. Cerruti Inc., 169 F.R.D. 573, 582–83 (S.D.N.Y. 1996). As a nonparty, Drucker ordinarily would not be subject to sanctions absent violation of a specific court order. See Cont'l Ins. Co. v. Atl. Cas. Ins. Co., No. 07-CV-3635, 2008 WL 3852046, at *2 (S.D.N.Y. Aug. 13, 2008). However, as the majority shareholder, chief executive, and only person affiliated with RxUSA to have a substantive role in this litigation, Drucker is RxUSA. He managed the litigation on RxUSA's behalf and represented RxUSA at every step. RxUSA acted only through him and RxUSA does not dispute that Drucker's conduct is attributable to RxUSA.

Accordingly, though Drucker did not violate a specific Court order, the Court has the inherent power to sanction him for his litigation misconduct. See Elec. Workers Pension Trust Fund of Local Union 58, IBEW v. Gary's Elec., 340 F.3d 373, 383 (6th Cir. 2003) (holding that "if a corporate officer avoids a court's order to the corporation by failing to take action or attempt compliance," the officer may be punished for contempt and "it is fully appropriate to impose judicial sanctions on the nonparty corporate officer.'") (quoting Wilson v. U.S., 221 U.S. 361, 376 (1911); citing U.S. v. United Mine Workers of America, 330 U.S. 258, 303–4 (1947)); see also Manez v. Bridgestone Firestone North American Tire, LLC, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court – a party, an attorney, or a nonparty witness – the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."); David v. Hooker, Ltd., 560 F.2d 412, 420–21 (9th Cir. 1977) (affirming district court's order requiring corporate defendant's sole

---

determines in its "informed discretion" that bad-faith conduct cannot be adequately sanctioned under a rules or statute, "the court may safely rely on its inherent power").

nonparty officer to pay plaintiff's expenses resulting from corporate defendant's failure to answer interrogatories); Thomas Am. Corp. v. Fitzgerald, 175 F.R.D. 462, 464, 466–67 (S.D.N.Y.) (1997) (ordering corporate plaintiff's former CEO to pay a fine pursuant to Rule 11 for filing a declaration that contained a factual misstatement); Jung, 2009 WL 762835, at *15 (sanctioning the nonparty husband and father of plaintiffs, who managed and funded the litigation on his family's behalf, for tampering with audio tapes in evidence); Helmac Products Corp. v. Roth (Plastics) Corp., 150 F.R.D. 563, 564–68 (E.D.M.I. 1993) (holding that the court has the inherent power to sanction a nonparty that is not subject to court order if the nonparty had a substantial interest in the outcome of the litigation and substantially participated in the proceedings).

**C. Sanctionable Conduct**

Drucker and RxUSA admit that the altered emails were fabricated and that RxUSA used them to advance their claims in the various ways identified by Amerisource. However, they deny creating the emails and assert that their reliance on them was an innocent mistake. Specifically, Drucker claims that he had no reason to questions these four documents out of the thousands produced in the case because they were consistent with his recollection regarding the WAC-15% discount and his correspondence with Amerisource personnel.

Amerisource has proven by clear and convincing evidence that Drucker created the altered emails. Drucker was one of only a small handful of people who had motive and access to the relevant email accounts and his fax header, the Paperport stamp, and the rxusal insignia all identify him as the culprit. There is no other logical conclusion consistent with the evidence. However, the evidence does not clearly and convincingly establish that when Drucker created the altered emails, he intended to manipulate this litigation or commit a fraud upon this Court.

11

Amerisource did not present evidence that Drucker knew or should have known a lawsuit would be filed the following year or that he anticipated using the altered documents to influence any litigation. Based on the record before the Court, it is equally probable that Drucker altered the emails in the hopes of dissuading Amerisource from filing a lawsuit and duping it into giving him the discounts or creating a compromise agreement.

Drucker's creation of the altered emails is nevertheless a critical fact because it proves that he and RxUSA acted in bad faith when they used the emails to support their claims and testified to their authenticity. As their creator, Drucker knew all along that the altered emails were fake, and he cannot now credibly claim that his repeated reliance on them was innocent. See, e.g., Stouffer, 221 F. Supp. 2d at 442 (holding that defendant's "knowing submission" of evidence containing a misrepresentation was a fraud upon the court); Furminator, Inc. v. Kim Laube & Co., Inc., No. 4:08-CV-367, 2009 WL 5176562, at *3 (E.D.M.O. Dec. 21, 2009) (finding that defendant's creation and use of fabricated evidence could not have been "made in error because the evidence suggests that Defendant attempted to avoid answering questions about the fabricated evidence and did nothing to correct the obviously false statements"). Moreover, contrary to RxUSA's assertions, the actual effect of the altered emails on the litigation is not relevant to whether the conduct is sanctionable. Drucker clearly acted in bad faith with the intent to manipulate this litigation and interfere with the Court's fair adjudication of the matter. Accordingly, his production of and testimony regarding the altered emails is sanctionable as a fraud upon the court.

**D. Appropriate Sanctions**

It is well-settled that courts may sanction litigation misconduct by ordering the offending party to pay the opposing party's attorneys' fees. Alyeska Pipeline Serv. Co. v. Wilderness

Soc'y, 421 U.S. 240, 258–59 (1975); Oliveri, 803 F.2d at 1272; F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 129 (1974). Such awards are intended to compensate the other party for additional expense caused by the offending party's misconduct. Chambers, 501 U.S. at 56. Amerisource requests the entirety of its litigation expenses, which total nearly $2.8 million. However, not all of Amerisource's fees were caused by RxUSA's fraud.[4] Evidence independent of the altered emails perpetuated the case and Amerisource has not shown by clear and convincing evidence that the altered emails lengthened the litigation. In denying summary judgment the first time, Judge Irizarry identified Drucker's affidavit regarding industry pricing standards and correspondence between Drucker and Amerisource management as further evidence supporting RxUSA's claims. The altered emails did not factor into Judge Irizarry's second summary judgment ruling. Moreover, the testimony of Drucker and LaFontaine alone, if credited, would have been a sufficient basis for a defense verdict. Amerisource also failed to demonstrate how the altered emails caused it to change its discovery, settlement, or litigation strategy, or incur expenses that it would have otherwise forgone.

The only exception is the obvious added expense of investigating the emails and pursuing sanctions. Amerisource expended $273,376.11 in pursuit of sanctions. Pl.'s Post-Hr'g Br. 13. However, much of this activity was unnecessary and did nothing to advance the inquiry. The expert computer discovery yielded little evidence of misconduct.[5] Other than the expert's hearing testimony, which explained the significance of the rxusal insignia and identified how the

---

[4] Additionally, Amerisource has already been awarded a substantial portion of its fees as the prevailing party on the underlying contract claim.

[5] The low value of the expert discovery is underscored by the difference between Amerisource's initial and renewed motions for sanctions. The initial motion, which seems to have been hastily filed without much forethought or leave of the Court, was over five hundred pages long, overflowed with minimally probative circumstantial forensic evidence, and primarily focused on the authenticity of Exhibit OO. The renewed motion for sanctions, which was much more modest, yet nevertheless successful in proving misconduct, made only a cursory mention of the expert discovery and completely abandoned the attack on Exhibit OO.

alteration was likely achieved, Amerisource's use of experts was superfluous. Amerisource proved Drucker's creation and use of the emails by ordinary evidence and logic. Thus, neither Amerisource's litigation costs nor its sanctions expenses provide an appropriate measure for sanctions.

Nevertheless, it is prudent to compensate litigants who are vigilant in exposing litigation fraud. Moreover, Drucker's conduct was a flagrant abuse of the judicial system and the Court is compelled not only to punish and deter such conduct but to vindicate itself. Accordingly, for the intentional bad faith reliance on fabricated evidence throughout the course of this litigation, the Court sanctions RxUSA and Drucker in the amount of $50,000 payable to Amerisource and an additional $50,000 payable to the Clerk of this Court.

### III. CONCLUSION

For the foregoing reasons, Amerisource's motion for sanctions is GRANTED and RxUSA and Drucker together are ORDERED to pay $50,000 to Amerisource and $50,000 to the Clerk of this Court. RxUSA and Drucker shall be held jointly and severally liable for the burden of these sanctions.

SO ORDERED.

Dated: July 6, 2010
Brooklyn, New York

/s/
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE